# WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES ET AL. *v.* GUARDIANSHIP ESTATE OF KEFFELER ET AL.

No. 01–1420.   Argued December 3, 2002—Decided February 25, 2003

SOUTER, J., delivered the opinion for a unanimous Court.

*Christine O. Gregoire*, Attorney General of Washington, argued the cause for petitioners. With her on the briefs were *William Berggren Collins*, Senior Assistant Attorney General, *Walter Dellinger*, and *Pamela Harris*.

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the briefs were *Solicitor General Olson*, *Assistant Attorney General McCallum*, *Deputy Solicitor General Kneedler*, *William Kanter*, and *Jonathan H. Levy*.

*Teresa Wynn Roseborough* argued the cause for respondents. With her on the brief were *Deborah M. Danzig*, *Richard B. Price*, and *Rodney M. Reinbold*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth*, Attorney General of Florida, *Thomas E. Warner*, Solicitor General, and *Matthew J. Conigliaro*, Deputy Solicitor General, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.*, of Alabama, *Bruce M. Botelho* of Alaska, *Fiti A. Sunia* of American Samoa, *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Thomas F. Reilly* of Massachusetts, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *David Samson* of New Jersey, *Eliot Spitzer* of New York, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Anabelle Rodríguez* of Puerto Rico, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Jerry W. Kilgore* of Virginia, *Iver A. Stridiron* of the Virgin Islands, *Darrell V. McGraw, Jr.*, of West Virginia, *James E. Doyle* of Wisconsin, and *Hoke MacMillan* of Wyoming; for the Counties of the State of California et al. by *Lloyd W. Pellman*, *Ada Gardiner*, *Catherine J. Pratt*, *Alan K. Marks*, and *Julie J. Surber*;

JUSTICE SOUTER delivered the opinion of the Court.

At its own expense, the State of Washington provides foster care to certain children removed from their parents' custody, and it also receives and manages Social Security benefits for many of the children involved, as permitted under the Social Security Act and regulations. The question here is whether the State's use of Social Security benefits to reimburse itself for some of its initial expenditures violates a provision of the Social Security Act protecting benefits from "execution, levy, attachment, garnishment, or other legal process." 42 U. S. C. § 407(a); see § 1383(d)(1). We hold that it does not.

I

A

The federal money in question comes under one or the other of two titles of the Social Security Act. Title II, 49 Stat. 622, as amended, 42 U. S. C. § 401 *et seq.*, is the Old-Age, Survivors, and Disability Insurance (OASDI) plan of benefits for elderly and disabled workers, and their survivors and dependents. A child may get OASDI payments if, say, the minor is unmarried and was dependent on a wage earner entitled to OASDI benefits. § 402(d). Title XVI of the Act, § 1381 *et seq.*, is the Supplemental Security Income (SSI) scheme of benefits for aged, blind, or disabled individuals, including children, whose income and assets fall below specified levels (the level for the latter currently being $2,000). §§ 1381–1382; 20 CFR § 416.1205(c) (2002).

and for the Children's Defense Fund et al. by *Michael L. Martinez* and *David L. Haga.*

Briefs of *amici curiae* urging affirmance were filed for AARP by *Rochelle Bobroff* and *Michael Schuster;* and for Omar M. Azzam et al. by *Douglas W. Grinnell, Donnie R. Cox, Dennis B. Atchley,* and *Paul W. Leehey.*

*Marsha L. Levick* filed a brief for the Juvenile Law Center et al. as *amici curiae.*

Although the Social Security Administration generally pays OASDI and SSI benefits directly, it may distribute them "for [a beneficiary's] use and benefit" to another individual or entity as the beneficiary's "'representative payee.'" 42 U. S. C. §§ 405(j)(1)(A), 1383(a)(2)(A)(ii)(I); see 20 CFR §§ 404.2001, 404.2010, 416.601, 416.610. In the exercise of its rulemaking authority, see 42 U. S. C. §§ 405(a), (j)(2)(A)(ii), the Administration has given priority to a child's parent, legal guardian, or relative when considering such an appointment. 20 CFR §§ 404.2021(b), 416.621(b). While the Act and regulations allow social service agencies and custodial institutions to serve in this capacity, such entities come last in order of preference. §§ 404.2021(b)(7), 416.621(b)(7); see also 42 U. S. C. §§ 405(j)(3)(F), 1383(a)(2)(D)(ii). Whoever the appointee may be, the Commissioner of Social Security must be satisfied that the particular appointment is "in the interest of" the beneficiary. §§ 405(j)(2)(A)(ii), 1383(a)(2)(B)(i)(II).[1]

Detailed regulations govern a representative payee's use of benefits. Generally, a payee must expend funds "only for the use and benefit of the beneficiary," in a way the payee determines "to be in the [beneficiary's] best interests." 20 CFR §§ 404.2035(a), 416.635(a). The regulations get more

_____

[1] Prior to making an appointment, the Commissioner must verify the potential representative payee's identity, connection to the beneficiary, and lack of relevant criminal record or prior misuse of Social Security funds. §§ 405(j)(2)(B), 1383(a)(2)(B)(ii); see 20 CFR §§ 404.2025, 416.625. The Commissioner must also attempt to identify any other potential representative payee whose appointment may be preferred. 42 U. S. C. §§ 405(j)(2)(A)(ii), 1383(a)(2)(B)(i)(II); see 20 CFR §§ 404.2020, 416.620.

In addition, the Commissioner is required to notify the beneficiary or the beneficiary's legal guardian of her intention to appoint a representative payee. 42 U. S. C. §§ 405(j)(2)(E)(ii), 1383(a)(2)(B)(xii); see 20 CFR §§ 404.2030, 416.630. "Any individual who is dissatisfied . . . with the designation of a particular person to serve as representative payee shall be entitled to a hearing by the Commissioner," with judicial review available thereafter. 42 U. S. C. §§ 405(j)(2)(E)(i), 1383(a)(2)(B)(xi).

specific in providing that payments made for "current main-
tenance" are deemed to be "for the use and benefit of
the beneficiary," defining "current maintenance" to in-
clude "cost[s] incurred in obtaining food, shelter, clothing,
medical care, and personal comfort items." §§ 404.2040(a),
416.640(a). Although a representative payee "may not be
required to use benefit payments to satisfy a debt of the ben-
eficiary" that arose before the period the benefit payments
are certified to cover, a payee may discharge such a debt "if
the current and reasonably foreseeable needs of the benefi-
ciary are met" and it is in the beneficiary's interest to do so.
§§ 404.2040(d), 416.640(d). Finally, if there are any funds left
over after a representative payee has used benefits for cur-
rent maintenance and other authorized purposes, the payee
is required to conserve or invest the funds and to hold them
in trust for the beneficiary. §§ 404.2045, 416.645.

The Act requires a representative payee to provide the
Commissioner with an accounting at least annually, 42
U. S. C. §§ 405(j)(3)(A), 1383(a)(2)(C)(i), and some institu-
tional representative payees are liable to triennial onsite
reviews by the Commissioner's staff, see Social Security
Admin., Increased Monitoring of Fee-for-Service and Volume
Representative Payees, Policy Instruction EM–00072 (June
1, 2000). In any case, the Commissioner may order a report
any time she "has reason to believe" that a payee is misusing
a beneficiary's funds, §§ 405(j)(3)(D), 1383(a)(2)(C)(iv), a crim-
inal offense that calls for revocation of the payee's appoint-
ment, §§ 405(j)(1)(A), 408(a)(5), 1383(a)(2)(A)(iii), 1383a(a)(4);
see 20 CFR §§ 404.2050, 416.650.

## B

The State of Washington, through petitioner Department
of Social and Health Services, makes foster care available
to abandoned, abused, neglected, or orphaned children
who have no guardians or other custodians able to care for
them adequately. See Wash. Rev. Code §§ 13.34.030(5),

13.34.130(1)(b) (2002). Although the department provides foster care without strings attached to any child who needs it, the State's policy is "to attempt to recover the costs of foster care from the parents of [the] children," 145 Wash. 2d 1, 6, 32 P. 3d 267, 269 (2001) (citing Wash. Rev. Code § 74.20A.010 (2001)), and to use "moneys and other funds" of the foster child to offset "the amount of public assistance otherwise payable," § 74.13.060. The department accordingly adopted a regulation providing that public benefits for a child, including benefits under SSI or OASDI, "shall be used on behalf of the child to help pay for the cost of the foster care received." Wash. Admin. Code § 388–70–069(1) (2001), repealed by Wash. St. Reg. 01–08–047 (Mar. 30, 2001).[2]

When the department receives Social Security benefits as representative payee for children in its care, it generally credits them to a special Foster Care Trust Fund Account kept by the state treasurer, which includes subsidiary accounts for each child beneficiary. When these accounts are debited, it is only rarely for a direct purchase by the State of a foster child's food, clothing, and shelter. The usual purchaser is a foster care provider, who is then paid back by the department according to a fixed compensation schedule. Every month, the department compares its payments to the provider of a child's care with the child's subsidiary account balance, on which the department then draws to reimburse itself. Since the State's outlay customarily exceeds a child's monthly Social Security benefits, the reimbursement to the State usually leaves the account empty until the next federal benefit check arrives.

The department occasionally departs from this practice, in the exercise of its discretion, to use the Social Security funds

---

[2] In April 2001, the department repealed § 388–70–069 and replaced it with a functionally similar provision. The new regulation provides that the department "must use income not exempted to cover the child's cost of care." Wash. Admin. Code § 388–25–0210.

"for extra items or special needs" ranging from orthodontics, educational expenses, and computers, through athletic equipment and holiday presents. 145 Wash. 2d, at 12, 32 P. 3d, at 272. And there have also been exceptional instances in which the department has forgone reimbursement for foster care to conserve a child's resources for expenses anticipated on impending emancipation. See App. to Pet. for Cert. A–57; App. 178.

C

As of September 1999, there were 10,578 foster children in the department's care, some 1,500 of them receiving OASDI or SSI benefits. The Commissioner had appointed the department to serve as representative payee for almost all of the latter children,[3] who are among respondents in this action brought on behalf of foster care children in the State of Washington who receive or have received OASDI or SSI benefits and for whom the department serves or has served as representative payee. In their 1995 class action filed in state court, they alleged, among other things, that the department's use of their Social Security benefits to reimburse itself for the costs of foster care violated 42 U. S. C. §§ 407(a) and 1383(d)(1). Section 407(a), commonly called the Act's "antiattachment" provision, provides that

> "[t]he right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

---

[3] Of the 1,480 children in foster care as of September 1999 who were receiving Social Security benefits, 923 were receiving SSI benefits, 469 were receiving OASDI benefits, and 88 were receiving both, and the department acted as representative payee for 1,411.

Section 1383(d)(1) incorporates this provision by reference and applies it to Title XVI of the Act.

Ruling on cross-motions for summary judgment, the trial court agreed with respondents. It enjoined the department from continuing to charge its costs of foster care against Social Security benefits, ordered restitution of previous reimbursement transfers, and awarded attorney's fees to respondents. The department appealed to the State Court of Appeals, which certified the case to the Supreme Court of Washington.

After remanding for further factfinding, the State Supreme Court affirmed the trial court's holding that the department's practices violated the antiattachment provisions.[4] Relying in part on *Philpott* v. *Essex County Welfare Bd.*, 409 U. S. 413 (1973), and *Bennett* v. *Arkansas*, 485 U. S. 395 (1988) *(per curiam)*, the state court reasoned that § 407(a) was intended to protect Social Security benefits from the claims of creditors, and consequently framed "the crucial question" as "[w]hether [the department] acts as a *creditor* when it reimburses itself for foster care costs out of the foster children's [benefits]." 145 Wash. 2d, at 17, 32 P. 3d, at 275 (emphasis in original). Its answer was a slightly qualified yes, that the department's "reimbursement scheme . . . involve[s] creditor-type acts," performed by resort to the "'other legal process'" barred by § 407(a). *Id.*, at 18, 22, 25, 32 P. 3d, at 257, 277–278.

The state court's analysis not only gave no deference to the Commissioner's regulations, but omitted any mention of

---

[4] In light of this holding, the State Supreme Court did not address respondents' other arguments, including the contention, accepted in the alternative by the trial court, that the department violated procedural due process by failing to provide notice of the "'intended result'" of its appointment as representative payee. 145 Wash. 2d 1, 15, 32 P. 3d 267, 274 (2001) (quoting Memorandum Opinion, No. 96–2–00157–2 (Wash. Super. Ct., Okanogan Cty., Sept. 29, 1998), p. 8, App. to Pet. for Cert. A–130).

the law governing rulemaking and interpretation by an administrative agency. Nor did the state court think it significant that it was the Commissioner of Social Security who had appointed the department to serve as representative payee for respondents' Social Security benefits. See *id.*, at 25, 32 P. 3d, at 278 (calling the department's representative payee status "at best immaterial to the analysis"). To the contrary, the court ultimately reasoned that the department's capacity as representative payee "further undercuts the legality of its reimbursement process" because a representative payee is charged with acting " 'in the best interests of the *beneficiary.*' " *Id.*, at 24, 32 P. 3d, at 278 (emphasis in original) (quoting 20 CFR § 404.2035(a)). "We seriously doubt using [Social Security] benefits to reimburse the state for its public assistance expenditure is in all cases, or even some, 'in the best interests of the beneficiary.' " 145 Wash. 2d, at 24, 32 P. 3d, at 278 (quoting § 404.2035(a)).[5]

Three justices concurred in part and dissented in part. They agreed with the majority that the department's use of Social Security benefits for *"past due* foster care payments" violated the antiattachment provisions of the Act. *Id.*, at 27, 32 P. 3d, at 279 (opinion of Bridge, J.) (emphasis in original). But they would have held that the department is entitled to use benefits to pay for *"current* maintenance costs, provided that any special needs of the children are satisfied first." *Ibid.* (emphasis in original).

After staying the State Supreme Court's mandate, 535 U. S. 923 (2002), we granted certiorari, 535 U. S. 1094 (2002), and now reverse.

---

[5] The State Supreme Court ultimately remanded for further consideration of the scope and basis for awarding attorney's fees. Our jurisdiction, which is premised on a "[f]inal judgmen[t] or decre[e]" within the meaning of 28 U. S. C. § 1257(a), is unaffected by this disposition. See *Pierce County* v. *Guillen, ante,* at 142–143.

## II

### A

Section 407(a) protects SSI and OASDI benefits from "execution, levy, attachment, garnishment, or other legal process." The Supreme Court of Washington approached respondents' claim by generalizing from this text and concluding that § 407(a) prohibits "creditor-type acts," on which reading it held that the department's reimbursement scheme was prohibited. The analysis was flawed.

First, neither § 407(a) nor the Commissioner's regulations interpreting that provision say anything about "creditors." Cf. *Philpott, supra,* at 417 ("[Section] 407 does not refer to any 'claim of creditors'; it imposes a broad bar against the use of any legal process to reach all social security benefits"). In fact, the Act and regulations to which we owe deference, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984), not only permit certain creditors to serve as representative payees, 42 U. S. C. §§ 405(j)(2)(C)(iii), 1383(a)(2)(B)(v), but allow a representative payee to satisfy even old debts of a beneficiary so long as current and reasonably foreseeable needs will be met and reimbursement is in the beneficiary's interest, 20 CFR §§ 404.2040(d), 416.640(d). Finally, as the Supreme Court of Washington apparently recognized (in qualifying its characterization of "creditor relationship" by referring to the department's acts as merely "creditor-type"), the department is simply not a creditor of the foster care children for whom it serves as representative payee. No law provides that they are liable to repay the department for the costs of their care, and the State of Washington makes no such claim.

The questions to be answered in resolving this case, then, do not go to the State's character as a creditor. The questions, instead, are whether the department's effort to become a representative payee, or its use of respondents' Social Security benefits when it acts in that capacity, amounts to em-

ploying an "execution, levy, attachment, garnishment, or other legal process" within the meaning of § 407(a).[6] For obvious reasons, respondents do not contend that the department's activities involve any execution, levy, attachment, or garnishment. These legal terms of art refer to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involve some form of judicial authorization. See, e. g., Black's Law Dictionary 123 (7th ed. 1999) (defining "provisional attachment" as a "prejudgment attachment in which the debtor's property is seized so that if the creditor ultimately prevails, the creditor will be assured of recovering on the judgment . . . . Ordinarily, a hearing must be held before the attachment takes place"); id., at 689 (defining "garnishment" as "[a] judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to or is bailee for the debtor to turn over to the creditor any of the debtor's property"). The department's efforts to become a representative payee and to use respondents' benefits do not even arguably employ any of these traditional procedures.

Thus, the case boils down to whether the department's manner of gaining control of the federal funds involves "other legal process," as the statute uses that term. That restriction to the statutory usage of "other legal process" is

---

[6] Respondents have apparently never argued that the reimbursement violates the § 407(a) bar to "transfe[r]" of benefits; nor would such a claim seem to hold any promise on the facts here. Respondents do, however, contend that the department's budgeting in anticipation of receiving Social Security benefits constitutes an "assign[ment]" prohibited by § 407(a). Congress could hardly have intended for this sort of budgeting, done by private and public representative payees alike, to run afoul of the antiattachment provisions of the Act, particularly since the Administration makes OASDI payments with a 1-month lag. See infra, at 387. To the extent that the text of § 407(a) is ambiguous on this score, the Commissioner's interpretation of the provision to permit such budgeting requires deference. See Skidmore v. Swift & Co., 323 U. S. 134, 139–140 (1944).

important here, for in the abstract the department does use legal process as the avenue to reimbursement: by a federal legal process the Commissioner appoints the department a representative payee,[7] and by a state legal process the department makes claims against the accounts kept by the state treasurer. The statute, however, uses the term "other legal process" far more restrictively, for under the established interpretative canons of *noscitur a sociis* and *ejusdem generis,* " '[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " *Circuit City Stores, Inc.* v. *Adams,* 532 U. S. 105, 114–115 (2001); see *Gutierrez* v. *Ada,* 528 U. S. 250, 255 (2000) ("[W]ords . . . are known by their companions"); *Jarecki* v. *G. D. Searle & Co.,* 367 U. S. 303, 307 (1961) ("The maxim *noscitur a sociis* . . . is often wisely applied where a word is capable of many

---

[7] Quite apart from any consequence of the interpretive canons discussed in the succeeding text, the mere fact of the department's appointment as representative payee could not reasonably be taken to contravene the antiattachment provision, contrary to respondents' suggestion. As already noted, the department's appointment is consistent with the sections of the Act governing appointment of representative payees, see 42 U. S. C. §§ 405(j)(2)(C), (3)(B) and (F), (4)(B), 1383(a)(2)(B)(v), (vii)(II), (C)(ii), (D)(ii), and with the Commissioner's regulations interpreting that section to authorize appointment of custodial institutions as a last resort, see 20 CFR §§ 404.2021(b)(7), 416.621(b)(7). To suggest that the department's appointment as representative payee, under the same statutory scheme that forbids the use of "other legal process," is itself forbidden legal process disregards the "cardinal rule that a statute is to be read as a whole," *King* v. *St. Vincent's Hospital,* 502 U. S. 215, 221 (1991), and ignores the Commissioner's reasonable regulations implementing the Act. See *King* v. *Schafer,* 940 F. 2d 1182, 1185 (CA8 1991) ("We cannot believe Congress contemplated this result in enacting § 407(a), particularly when this result would be contrary to another provision of the Social Security Act: § 405(j), providing for the appointment of representative payees"), cert. denied *sub nom. Crytes* v. *Schafer,* 502 U. S. 1095 (1992); 940 F. 2d, at 1185 ("Section 407(a) was not intended to outlaw a procedure expressly authorized by the Social Security Administration's own regulations").

meanings in order to avoid the giving of unintended breadth to the Acts of Congress"). Thus, "other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

In this case, the product of these canons of construction is confirmed by legal guidance in the Commissioner's own interpretation of "legal process." The Social Security Administration's Program Operations Manual System (POMS), the publicly available operating instructions for processing Social Security claims, defines "legal process" as used in § 407(a) as "the means by which a court (or agency or official authorized by law) compels compliance with its demand; generally, it is a court order." POMS GN 02410.001 (2002), available at http://policy.ssa.gov/poms.nsf/aboutpoms (as visited Jan. 23, 2003) (available in Clerk of Court's case file). Elsewhere in the POMS, the Commissioner defines "legal process" similarly as "any writ, order, summons or other similar process *in the nature of garnishment.* It may include, but is not limited to, an attachment, writ of execution, income execution order or wage assignment that is issued by . . . [a] court of competent jurisdiction . . . [or a]n authorized official pursuant to an order of a court of competent jurisdiction or pursuant to State or local law . . . [a]nd is directed to a governmental entity." POMS GN 02410.200 (emphasis added). While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect in closing the door on any suggestion that the usual rules of statutory construction should get short shrift for the sake of reading "other legal process" in abstract breadth. See *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 139–140 (1944);

see also *United States* v. *Mead Corp.*, 533 U. S. 218, 228, 234–235 (2001).

On this restrictive understanding of "other legal process," it is apparent that the department's efforts to become respondents' representative payee and its use of respondents' benefits in that capacity involve nothing of the sort.[8] Whereas the object of the processes specifically named is to discharge, or secure discharge of, some enforceable obligation, the State has no enforceable claim against its foster children. And although execution, levy, attachment, and garnishment typically involve the exercise of some sort of judicial or quasi-judicial authority to gain control over another's property, the department's reimbursement scheme operates on funds already in the department's possession and control, held on terms that allow the reimbursement.

The regulations previously quoted specify that payments made for a beneficiary's "current maintenance" are deemed to be "for the use and benefit of the beneficiary," and define "current maintenance" to include "cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 CFR §§ 404.2040(a), 416.640(a). There is no question that the state funds to be reimbursed were spent for items of "current maintenance," and although the State typically makes the accounting reimbursement two months after spending its own funds, this practice is consistent with the regulation's definition of "current maintenance" as "costs incurred" for food and the like. That the State is dealing with the funds consistently with Social Security regulations is confirmed by the Commissioner's own interpretation of

---

[8] In arguing that § 407(a) applies here, respondents rely in part on § 407(b), which provides that "[n]o other provision of law . . . may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section." Given our conclusion that § 407(a), by its terms, does not apply, however, respondents' reliance is misplaced.

those regulations as allowing reimbursement by a representative payee for maintenance costs, at least for costs incurred after the first benefit payment is made to the payee. Cf. POMS GN 00602.030 (defining a "past debt," which may be satisfied only if a beneficiary's current and reasonably foreseeable needs are met, as "a debt the beneficiary incurred before the date of the first benefit payment is made to the current payee").[9]

The Government has gone even further to support this as a reasonable interpretation, text aside, owing to significant advantages of the reimbursement method in providing accurate documentation and allowing for easy monitoring of representative payees in administering Social Security. See Brief for United States as *Amicus Curiae* 28–29.[10] In fact, it would be hard not to see this type of slightly delayed reimbursement as the only way OASDI funds could be spent on a foster child's current maintenance, since the Administration disburses those Social Security benefits with a time lag. See POMS GN 02401.001 (noting that OASDI benefits are dispensed within the month after they are due). In short, the Commissioner's interpretation of her own regulations is

[9] There is one exception to this rule, although it is not relevant for our present purposes. In October 1996, Congress amended 42 U. S. C. § 1383 to specify that when the Administration issues a retroactive lump sum payment of SSI benefits that exceeds six times the monthly benefit amount, that amount is to be deposited directly into a dedicated interest-bearing bank account to be used only for certain special needs. § 1383(a)(2)(F).

[10] Moreover, as the Government notes, the position of the Supreme Court of Washington and respondents is ultimately "one of empty formalism" because a State could, indisputably, use a foster child's Social Security benefits directly for the costs of care and then reduce the State's own funding by the same amount. Brief for United States as *Amicus Curiae* 28. The financial result would be the same as in the system currently used by the department, yet the practical advantages of the reimbursement method of accounting would be lost.

eminently sensible and should have been given deference under *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997).[11]

The Supreme Court of Washington rested its contrary conclusion, in part, on our decisions in *Philpott* v. *Essex County Welfare Bd.*, 409 U. S. 413 (1973), and *Bennett* v. *Arkansas*, 485 U. S. 395 (1988) *(per curiam)*. But both *Philpott* and *Bennett* involved judicial actions in which a State sought to attach a beneficiary's Social Security benefits as reimbursement for the costs of the beneficiary's care and maintenance. See *Philpott, supra,* at 415 ("Respondent sued to reach the bank account"); *Bennett, supra,* at 396 ("The State filed separate actions in state court seeking to attach Social Security benefits"). In each case, we held that the plain language of § 407(a) barred the State's legal action, and refused to find an implied exception to the antiattachment provision for a State simply because it provides for the care and maintenance of a beneficiary. See *Philpott, supra,* at 416; *Bennett, supra,* at 397. Unlike the present case, then, both *Philpott* and *Bennett* involved forms of legal process expressly prohibited by § 407(a). In neither case was the State acting as a representative payee in seeking to use the funds as reim-

---

[11] It bears mentioning that nothing in the State Supreme Court's reasoning limits its holding to state agencies. The state court's logic would apply equally to parents serving as representative payees, since they, like the department, are under a legal obligation to support their children's basic needs irrespective of Social Security benefits. See, *e. g.,* Wash. Rev. Code § 74.20A.010 (2002). We find it hard to believe that Congress would have intended this result, which would likely impose onerous and absurd accounting requirements on parents. See, *e. g., Mellies* v. *Mellies,* 249 Kan. 28, 33, 815 P. 2d 114, 117 (1991) (holding that a parent "had no obligation to exhaust his personal finances in providing for [his child's] support before spending any of [the child's] social security benefits on the child's maintenance"); *In re Guardianship of Nelson,* 547 N. W. 2d 105, 108, 109 (Minn. Ct. App. 1996) (stating that because Social Security benefits are "not a windfall" for the beneficiary, "a representative payee parent can use his or her child's social security survivor benefits for the child's current maintenance regardless of the parent's financial ability to meet those needs").

bursement for the costs incurred in providing for the beneficiary's care and maintenance.

## B

The poor fit between § 407(a) and respondents' argument points to the real basis of their objections to the reimbursement practice. At bottom, respondents' position and the State Supreme Court's holding reflect a view that allowing a state agency to reimburse itself for the costs of foster care is antithetical to the best interest of the beneficiary foster child. See 145 Wash. 2d, at 17, 32 P. 3d, at 275 (contending that a foster child "is better off with any payee other than the [department] because [the department] must provide foster care under state law *regardless* of whether it receives a reimbursement" (emphasis in original)); *id.*, at 24, 32 P. 3d, at 278 ("We seriously doubt using [Social Security] benefits to reimburse the state for its public assistance expenditure is in all cases, or even some, 'in the best interests of the beneficiary'" (quoting 20 CFR § 404.2035(a))).

Although it is true that the State could not directly compel the beneficiary or any other representative payee to pay Social Security benefits over to the State, that fact does not render the appointment of a self-reimbursing representative payee at odds with the Commissioner's mandate to find that a beneficiary's "interest . . . would be served" by the appointment. 42 U. S. C. §§ 405(j)(1)(A), 1383(a)(2)(A)(ii)(I).[12] Re-

---

[12] Respondents also go beyond the § 407(a) issue to argue that the department violates § 405(j) itself, by, for example, failing to exercise discretion in how it uses benefits, periodically "sweeping" beneficiaries' accounts to pay for past care, and "double dipping" by using benefits to reimburse the State for costs previously recouped from other sources. These allegations, and respondents' § 405(j) stand-alone arguments more generally, are far afield of the question on which we granted certiorari. Moreover, constitutional claims aside, respondents' complaint and the class-action certification related only to § 407(a). Accordingly, we decline to reach respondents' § 405(j) arguments here, except insofar as they relate to the proper interpretation of § 407(a). Respondents are free to press their stand-

spondents' premise that promoting the "best interests" of a beneficiary requires maximizing resources from left-over benefit income ignores the settled principle of administrative law that an open-ended and potentially vague term is highly susceptible to administrative interpretation subject to judicial deference. See *Chevron*, 467 U. S., at 842–843. Under her statutory authority, the Commissioner has read the "interest" of the beneficiary in light of the basic objectives of the Act: to provide a "minimum level of income" to children who would not "have sufficient income and resources to maintain a standard of living at the established Federal minimum income level," 20 CFR § 416.110 (SSI); see also *Sullivan* v. *Zebley*, 493 U. S. 521, 524 (1990), and to provide workers and their families the "income required for ordinary and necessary living expenses," § 404.508(a) (OASDI); see also *Califano* v. *Jobst*, 434 U. S. 47, 50 (1977). The Commissioner, that is, has decided that a representative payee serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants.

This judgment is not only obviously within the bounds of the reasonable, but one confirmed by the demonstrably antithetical character of respondents' position to the best interest of many foster care children. SSI beneficiaries would be most obviously subject to threat, since eligibility for benefits of these child recipients is lost if their assets creep above a certain minimal level, currently $2,000. See 42 U. S. C. §§ 1382(a)(1)(B), (3)(B); 20 CFR § 416.1205(c). Many foster children would lose SSI benefits altogether if respondents prevailed. See Brief for Children's Defense Fund et al. as *Amici Curiae* 20; Brief for Counties of the State of California et al. as *Amici Curiae* 16–18. But foster children beneficiaries under both SSI and OASDI would suffer from a broader disadvantage. Respondents' argument forgets the

alone § 405(j) arguments before the Commissioner, who bears responsibility for overseeing representative payees, or elsewhere as appropriate.

fact that public institutions like the department are last in the line of eligibility for appointment as representative payees; the Commissioner appoints them only when no one else will do. See 20 CFR §§ 404.2021(b), 416.621(b). If respondents had their way, however, public offices like the department might well not be there to serve as payees even as the last resort, for there is reason to believe that if state agencies could not use Social Security benefits to reimburse the State in funding current costs of foster care, many States would be discouraged from accepting appointment as representative payees by the administrative costs of acting in that capacity. See Brief for Children's Defense Fund, *supra*, at 21; Brief for State of Florida et al. as *Amici Curiae* 7.[13]   And without such agencies to identify children eligible for federal benefits and to help them qualify, see Brief for Children's Defense Fund, *supra*, at 20–24; Brief for State of Florida, *supra*, at 3–5; Brief for United States as *Amicus Curiae* 17, many eligible children would either obtain no Social Security benefits or need some very good luck to get them.   With a smaller total pool of money for their potential use, the chances of having funds for genuine needs beyond immediate support would obviously shrink, to the children's loss.   Respondents' position, in sum, would tend to produce worse representative payees in these cases, with less money to spend.

---

[13] The Act does allow a state representative payee to use the lesser of 10 percent of monthly benefits or $25 per month to offset administrative expenses.   See 42 U. S. C. §§ 405(j)(4)(A)(i), 1383(a)(2)(D)(i).   Nevertheless, at least with respect to SSI, many States spend considerably more to identify eligible foster children and assist them in obtaining benefits.   According to the department, for example, the process of screening potential SSI applicants among foster children and applying for benefits on their behalf involves 27 staff members and costs $1.9 million annually.   See Application to Recall and Stay the Mandate of the Supreme Court of Washington Pending Certiorari, No. 01A557, pp. 18–19.   For this reason, the department has said that it would not seek to become the representative payee for SSI beneficiaries absent an ability to use benefits to recoup some costs.   See *ibid.*

## III

The department's reimbursement from respondents' Social Security benefits does not violate § 407(a). The judgment of the Supreme Court of Washington is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*