In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2229

DANNY J. RAY,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:17-cv-01322 — **Matthew P. Brookman**, *Magistrate Judge.*

ARGUED JANUARY 23, 2019 — DECIDED FEBRUARY 12, 2019

Before WOOD, *Chief Judge*, and KANNE, and ST. EVE, *Circuit Judges*.

PER CURIAM. Danny Ray applied for Supplemental Security Income and Disability Insurance Benefits based on a host of physical disorders and mental conditions. An administrative law judge found that Ray was severely impaired by most of his physical conditions, but she denied benefits after finding that he could perform his past relevant work as a school

bus monitor. Ray challenges that finding, arguing that the ALJ erroneously discredited him, failed to treat his prior job as "composite," and improperly assessed his functional abilities compared to the job requirements for a bus monitor in the general economy. The district court affirmed the ALJ's decision. We agree with Ray and vacate the judgment.

## I. BACKGROUND

Ray lives with diabetes, hypertension, obesity, kidney disease, degenerative disc disease, anxiety, and depression. When his conditions worsened, he began working gradually easier jobs, from janitor to forklift operator to bus monitor for children with special needs, until eventually he gave up his employment entirely. As a bus monitor, he would lift disabled children into their seats on the bus, strap down wheelchairs, and monitor the children's behavior. He ultimately quit because it was too painful for his hands, feet, and hips.

Ray receives medical care for his physical impairments but has been noncompliant with some treatments, mostly in relation to his diabetes. He struggles to remember to test his blood-glucose levels, eat healthfully, and take insulin. Doctors who treat Ray's back condition also have noted that he takes more pain medication than the prescribed amount.

In November 2013, Ray applied for social security benefits. During the review process, two consulting state-agency psychologists and an examining clinical psychologist, Dr. Zera, evaluated his functioning. The consulting psychologists both concluded that Ray is moderately limited in his ability to maintain attention and concentration for extended periods but is not significantly limited in any other aspect of concentration, persistence, or pace. Dr. Zera determined that

Ray has an anxiety disorder and learning disorder, noting his "difficulty reading and poor math skills." Ray also met with Dr. Fish, an agency physician, who determined that Ray's major functional impairment is exertional tolerance. Dr. Fish noted a positive result from a supine straight-leg test, which reflects lumbar nerve root compression, though the less-sensitive seated test was negative.[1]

The agency denied Ray's applications initially and upon reconsideration, and his case proceeded to a hearing with an ALJ. At the hearing, Ray testified—and his mother and girlfriend corroborated with written statements—that his daily activities include taking his medication, making himself three simple meals, watching television, using the dishwasher, and showering (while using a shower seat). Outside of these tasks, he sits and watches television. Ray occasionally does laundry if reminded, and he had the laundry machines moved from the basement to the first floor of his house because the stairs were difficult for him. Once per week, he goes grocery shopping with the assistance of an electric cart. When he did not have family to drive him, the hospital provided him a bus pass because he is physically incapable of walking home.

In addition to his physical impairments, Ray has limited intellect. He testified that he completed eight grades of special education, but he struggles to read and write. Although he will occasionally purchase a newspaper, it takes time for him to make sense of what he sees. Because of his limitations, his

---

[1] *See* Alon Rabin, et al., *The Sensitivity of the Seated Straight-Leg Raise Test Compared with the Supine Straight-Leg Raise Test in Patients Presenting with Magnetic Resonance Imaging Evidence of Lumbar Nerve Root Compression*, 88 PHYSICAL MED. & REHAB. 840, 842 (2007).

mother or girlfriend must write his checks and complete his paperwork.

In her decision, the ALJ analyzed Ray's application based on the five-step process set forth in 20 C.F.R. § 404.1520 and found him not disabled. She determined that he is not engaged in substantial gainful employment (step one) and that he has severe impairments of diabetes mellitus, obesity, degenerative disc disease, osteoarthritis of the hip, coronary artery disease, kidney disease, hypertension, and a history of atrial fibrillation (step two). But his impairments, she concluded, do not meet a listing (step three).

The ALJ determined that Ray has the residual functional capacity ("RFC") to perform light work (lifting ten to twenty pounds) and to stand or walk for six hours. She also found that he is able to "understand, remember, and carry out semi-skilled tasks" and "attend to tasks for a sufficient period in order to complete tasks." Regarding Ray's limitations, the ALJ found him only "partially credible," largely based on the notion that, if his symptoms were as severe as alleged, his daily activities would be more restricted and he would be more compliant with his prescribed treatments.

The ALJ presented Ray's RFC to the vocational expert, who concluded that Ray could work as a school bus monitor—not as he had performed the job, but as it is performed in the national economy. At the hearing, Ray questioned the vocational expert about the required level of language development for that position. The vocational expert confirmed that a requirement of the job, as it is generally performed, is the ability to "write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs."

At the hearing and in a supplemental brief, Ray argued that his previous position as a bus monitor for disabled schoolchildren was a composite job—that is, one that combines "significant elements of two or more occupations and, as such, ha[s] no counterpart in the [Dictionary of Occupational Titles]," Social Security Ruling 82-61. His job, Ray argued, involved substantial activities from both the school bus monitor and child care attendant positions as they are described in the DOT. Ray questioned the vocational expert on this subject, but the testimony is transcribed as "inaudible" during the key responses, and Ray and the agency represent those portions differently.

In her written decision, however, the ALJ dismissed Ray's argument about composite jobs as "unpersuasive and unsupported" and concluded that Ray could be a bus monitor as that job is generally performed. She did not discuss the undisputed language-development requirements for that position. Ultimately, based on the vocational expert's testimony that Ray could perform his past relevant work, the ALJ concluded that he is not disabled.

## II. ANALYSIS

We uphold an ALJ's decision only if substantial evidence from the record supports her determination. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

Ray raises four challenges in this appeal: (1) the ALJ erred in evaluating his daily activities and medical reports, making her credibility determination patently wrong; (2) the ALJ erred in concluding that he could perform his past relevant work because his bus-monitor job was a composite job, which precludes a finding at step four; (3) the ALJ erred in finding

that he could do the bus-monitor job as generally performed because he does not meet the necessary General Educational Development Level; and (4) the ALJ erred in assessing his mental impairments by finding them not severe and by not including any limitations on concentration, persistence, and pace in his RFC.

With respect to the adverse credibility determination, this is the rare case in which the claimant can overcome the "considerable deference" we afford such findings unless they are "patently wrong," *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Specifically, the ALJ erroneously evaluated Ray's symptoms and daily activities, misinterpreted medical evidence, and failed to ask why he skipped some appointments.

In assessing Ray's back and hip pain, the ALJ acknowledged that Ray had a herniating disc, degenerative disc and joint disease of the lower lumber spine, a herniated nucleus pulpous, and chronic pain syndrome. But to support her determination that these impairments "are not as limiting as he alleged," she cited irrelevant records from treatment he received for a staph infection and she noted that his extremities were not fractured, tender, or swollen. The connection between those characteristics and Ray's alleged pain and restricted mobility is nowhere explained. She also mischaracterized Dr. Fish's report, writing that the straight-leg raise test was negative when the opposite was true.

The ALJ also improperly emphasized Ray's lack of follow-up on a recommended spine evaluation and his difficulty with medication compliance. Within five years, Ray missed two follow-up appointments, one for his heart and one for his spine. When the ALJ asked him about the missed cardiology appointment, he explained that he was uninsured at the time

and could not afford it. Although the record showed that Ray had repeatedly lost his health insurance, the ALJ did not ask him about his missed spine appointment and instead assumed that he did not attend because his symptoms were not serious. That was reversible error; an ALJ must not draw inferences about a claimant's lack of treatment without exploring the reasons for the inaction. *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Moreover, the ALJ bolstered her presumption with evidence of Ray's difficulty with medication compliance, even though, with respect to his pain (as opposed to his diabetes), those medical records point to Ray's credibility. Ray's "noncompliance" with his musculoskeletal treatment stemmed from taking pain medication too frequently, which does not support the ALJ's inference that he was exaggerating his pain.

The ALJ also overemphasized Ray's daily living activities. The only evidence of those activities comes from Ray's testimony (which apparently the ALJ credited in this aspect) and his family's, and it shows that the sum of Ray's daily routine involves showering *while seated*, fixing simple meals, and using the dishwasher. In between these activities, he sits and watches television. He could not walk even two hours home from the hospital, a stark contrast to the ALJ's finding that he can stand or walk six hours every day. Ray's minimal daily activities do not support the ALJ's finding that he exaggerated his symptoms, nor do they support the ultimate RFC. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Although the ALJ credited him with caring for his son, his son is an adult, and no evidence reflects the type of "care" that Ray supposedly provided. Further, the struggle of living with his son at one point sent Ray into a suicidal decompensation.

Ray is also correct that the ALJ made two technical errors at step four that led to the unsupportable conclusion that he could perform his past relevant work as a bus monitor as that position exists in the national economy. First, the ALJ concluded that Ray's former position was not a "composite" job and, therefore, that it could be assessed with reference to the Dictionary of Occupational Titles. A claimant is not disabled if he can do his past relevant work either in the manner he performed it before the impairment *or* in the manner it is generally performed in the national economy. *See Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008). But if the prior position was a composite job, then the ALJ may not reference it when determining whether a claimant can perform his past job as it is generally performed. *See* Programs Operation Manual System DI 25005.020; *see also Wash. State Dep't of Soc. & Health Servs. v. Keffeler*, 537 U.S. 371, 385 (2003) (POMS serve as guidance and "warrant respect"); *Cannon v. Apfel*, 213 F.3d 970, 975 (7th Cir. 2000) (same).

Ray argues that his prior job was a composite job that combined elements of the school bus monitor and school child-care attendant positions. He cites the vocational expert's testimony to support his position, asserting that the expert testified that his bus monitor position was a composite job. The agency, for its part, asserts that the expert testified to the opposite. Because key parts of the vocational expert's testimony are marked as "[inaudible]," his opinion is not clear. But a review of the duties of a school child-care attendant bolsters Ray's point:

> Attends to personal needs of handicapped children while in school to receive specialized academic and physical training: Wheels handicapped children to classes, lunchrooms, treatment rooms, and other

areas of building. *Secures children in equipment, such as chairs*, slings, or stretchers, and places or hoists children into baths or pools. Monitors children using life support equipment to detect indications of malfunctioning of equipment and calls for medical assistance when needed. *Helps children to walk, board buses*, put on prosthetic appliances, eat, dress, bathe, and perform other physical activities as their needs require.

U.S. Dep't of Lab., 1 Dictionary of Occupational Titles 258 (4th ed. 1991) (emphasis added). On the other hand, the duties of a school bus monitor are:

Monitors conduct of students on school bus to maintain discipline and safety: Directs loading of students on bus to prevent congestion and unsafe conditions. Rides school bus to prevent altercations between students and damage to bus. Participates in school bus safety drills. May disembark from school bus at railroad crossings and clear bus across tracks.

*Id.* at 269.

Here, the ALJ concluded that Ray's previous bus-monitor job was not a composite job because his work matched the DOT description "in all but the exertional requirements." But Ray's testimony (the only evidence of his job duties) demonstrates that as a bus monitor he performed significant elements of the childcare-attendant job, like assisting the students in boarding buses and securing them in their equipment and chairs. The DOT description of the bus-monitor job does not include these duties, and the vocational expert's testimony is ambiguous. Thus, substantial evidence does not support the ALJ's conclusion that Ray's previous job was not a composite job.

Relatedly, Ray argues that the ALJ erred further by concluding that he could work as a bus monitor as the job is generally performed despite his lacking the necessary General Educational Development Level for that job. The bus-monitor position requires at least a Language Development Level 2, which expects that employees will be able to, among other things, "[w]rite compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs"; "[r]ead adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation"; and "[r]ead instructions for assembling model cars and airplanes." U.S. Dep't of Lab., 2 Dictionary of Occupational Titles 1011 (4th ed. 1991). No evidence supports the ALJ's implied finding that Ray has these skills.

To the contrary, Ray testified that he does not fill out his own checks or paperwork because he misspells words and that he can barely read a newspaper article, a limitation confirmed in Dr. Zera's evaluation. When a vocational expert's testimony that a claimant can perform a job conflicts with the claimant's ability to meet the job's listed requirements in the DOT, then the ALJ must resolve that conflict before relying on the testimony to support her disability findings. *See* Social Security Ruling 00-4p; *Brown v. Colvin*, 845 F.3d 247, 255 (7th Cir. 2016); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ's failure to do that here, along with the other errors at step four, warrants remand. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (cumulative effect of multiple errors warranted remand).

Finally, Ray argues that the ALJ erred in evaluating his mental limitations, first by finding them not severe at step two

and later by not including any limitations on concentration, persistence, and pace in the RFC. To some extent, Ray is mistaken. Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). Either way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe. 20 C.F.R. § 404.1523; *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). Nevertheless, the ALJ based the RFC on her flawed credibility finding, which led her to discredit the opinions of the two agency experts who concluded that Ray had a severe mental impairment. Therefore, the ALJ will have to revisit her assessment of Ray's mental impairments in any case.

Accordingly, we VACATE the judgment and REMAND to the district court with instructions to remand the case to the agency for further proceedings.