Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued December 9, 2003      Decided March 16, 2004

No. 02-3073

UNITED STATES OF AMERICA,
APPELLEE

v.

LAWRENCE E. THOMAS,
APPELLANT

————

Consolidated with
02–3121 and 03–3053

————

Appeals from the United States District Court
for the District of Columbia
(No. 01cr00423–01)
(No. 02cr00132–01)
(No. 99cr00399–01)

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellants. With her on the briefs were *A. J. Kramer*, Federal Public Defender, and *Tony Axam, Jr.* and *Erica J. Hashimoto*, Assistant Federal Public Defenders. *Tony W. Miles*, Assistant Federal Public Defender, entered an appearance.

*Suzanne Grealy Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher*, *Barbara J. Valliere*, and *Stephen J. Gripkey*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and GARLAND and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The defendants in these consolidated cases raise two questions under the United States Sentencing Guidelines. The first, which is a question of first impression in this circuit, is whether escape is a crime of violence under Guideline § 4B1.2(a)(2) — the guideline that defines the crimes that trigger career offender sentencing enhancements. The second question, upon which there is controlling precedent, is whether the district courts that sentenced two of the defendants erred by relying on the defendants' arrest records in denying their motions for sentencing departures pursuant to Guideline § 4A1.3.

I

On February 28, 2000, Lawrence Thomas pled guilty to one count of bank robbery in violation of 18 U.S.C. § 2113(a). On July 30, 2002, the United States District Court for the District of Columbia sentenced Thomas as a "career offender" pursuant to U.S. SENTENCING GUIDELINES MANUAL § 4B1.1 [hereinafter U.S.S.G.].[1] That provision subjects a defendant to a substantial sentencing enhancement if, among other

_____

[1] Thomas was sentenced under the 2000 edition of the Manual; Smith was sentenced under the 2001 edition; and Cook was sentenced under the 2002 edition. The three editions were identical in all respects relevant here.

things, he has two prior felony convictions for "crime[s] of violence" or "controlled substance offense[s]," as defined in § 4B1.2. U.S.S.G. § 4B1.1(a); *see id.* cmt. n.1. In sentencing Thomas as a career offender, the district court determined that Thomas had previously been convicted of at least two qualifying crimes of violence. The court based that determination on Thomas' 1977 armed robbery conviction, and on his three prior convictions for escape: a 1987 conviction for violating the District of Columbia's former prison breach statute, D.C. Code § 22–2601 (1973); a 1988 conviction for violating the same statute; and a 1995 conviction for escape from a federal facility in violation of 18 U.S.C. § 751(a). These past convictions, the court concluded, triggered § 4B1.1, thus increasing Thomas' guidelines offense level from 24 to 32 and placing Thomas in criminal history category VI. *See* Thomas Presentence Investigation Report (PSR) ¶¶ 19–20, 41.[2]

Thomas challenged this conclusion, arguing that, although his conviction for armed robbery concededly qualified as a crime of violence under Guideline § 4B1.2(a), his previous escape convictions did not. Thomas also maintained that category VI over-represented the seriousness of his criminal history, and urged the district court to grant a downward departure from his guidelines sentencing range pursuant to Guideline § 4A1.3. The district court rejected Thomas' arguments, holding that escape was a crime of violence, and that — in light of Thomas' record of arrests and convictions — category VI did not overstate his criminal history. The court did, however, decrease Thomas' offense level by 3 levels for accepting responsibility for his crime, *see* U.S.S.G. § 3E1.1(a)–(b), and by another 8 levels because Thomas had provided substantial assistance to law enforcement after his arrest, *id.* § 5K1.1. Thomas Sentencing Hr'g Tr. at 46 (July 30, 2002). This resulted in an offense level of 21, which,

---

[2] Guideline § 4B1.1(b) mandates a criminal history category of VI for all career offenders. U.S.S.G. § 4B1.1(b). It also mandates an offense level of (at least) 32 when the instant offense of conviction carries a statutory maximum of between 20 and 25 years' imprisonment. *Id.*

combined with a criminal history category of VI, yielded a sentencing range of 77–96 months. U.S.S.G. ch. 5, pt. A (sentencing table). The district court sentenced Thomas to 80 months in prison.

On March 28, 2002, Dale Smith pled guilty to one count of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). He also accepted responsibility for 2.5 grams of cocaine powder as conduct relevant to that offense. At sentencing, the district court concluded — over the defendant's objection — that Smith was a career offender based on two prior felony convictions: a 1993 conviction for possession with intent to distribute cocaine, and a 1997 conviction for escape from an institution in violation of the current D.C. Code escape statute, D.C. Code § 22–2601(a)(1) (2001). The career offender designation gave Smith an adjusted offense level of 29 (after a 3–level reduction for acceptance of responsibility), and a criminal history category VI. That combination mandated a guideline sentencing range of 151–188 months' imprisonment, as compared to what would have been a range of 33–41 months without the career offender designation. *Compare* Smith PSR ¶¶ 28, 85, *with id.* ¶¶ 25, 27, 41, *and* U.S.S.G. ch. 5, pt. A. Like Thomas, Smith filed a motion for a downward departure pursuant to Guideline § 4A1.3, claiming that, even if he technically qualified as a "career offender" under § 4B1.1, that designation significantly overstated the seriousness of his criminal history. The district court denied the motion in light of Smith's history of arrests and convictions, and sentenced Smith to a 151–month term of incarceration.

Finally, on April 4, 2002, Andrew Cook, Jr. pled guilty to one count of a five-count indictment charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Although that crime generally carries a base offense level of 14, that level increases to 24 if the defendant has two prior felony convictions for "crime[s] of violence" or controlled substance offenses, as defined "in U.S.S.G. § 4B1.2(a)." U.S.S.G. § 2K2.1(a), cmt. n.5; *see id.* § 2K2.1(a). Over Cook's objection, the district court found that Cook had two prior convictions for crimes of violence: a

1970 armed robbery and a 1989 prison breach in violation of former D.C. Code § 22–2601 (1973).[3] After the district court subtracted 5 levels for substantial assistance to law enforcement and 3 levels for acceptance of responsibility, Cook's adjusted offense level was 16. *See* Cook PSR ¶¶ 16, 22, 23; Cook Sentencing Hr'g Tr. at 21 (Dec. 16, 2002). Combined with a criminal history category of V, the guideline sentencing range was 41–51 months. U.S.S.G. ch. 5, pt. A. The court sentenced Cook to 41 months in prison, the bottom of the range.

All three defendants filed timely notices of appeal. Although their crimes were unrelated, we granted the defendants' unopposed motion to consolidate their appeals because they raised common questions of law. In Part II, we consider whether escape is properly regarded as a crime of violence under Guideline § 4B1.2(a). In Part III, we consider whether the district courts erred by relying on arrest records in denying Thomas' and Smith's motions for downward departures under § 4A1.3.

## II

At sentencing, each defendant objected to the enhancement of his sentence based on the designation of a prior escape offense as a "crime of violence," as that term is defined in Guideline § 4B1.2(a). Whether a particular crime constitutes a crime of violence under the Sentencing Guidelines is a question of law, which we review de novo. *See United States v. Hill*, 131 F.3d 1056, 1062 n.5 (D.C. Cir. 1997); *United States v. Mathis*, 963 F.2d 399, 404 (D.C. Cir. 1992).

Guideline § 4B1.2(a) defines "crime of violence" as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that —

---

[3] Cook also moved for a downward departure under Guideline § 4A1.3, but unlike defendants Thomas and Smith, he does not appeal the district court's denial of that motion.

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another.*

U.S.S.G. § 4B1.2(a) (emphasis added). All of the circuits that have considered the question — numbering nine to date — have concluded that the crime of escape falls within the ambit of § 4B1.2(a).[4] Today, we join them.

---

[4] *See United States v. Jackson*, 301 F.3d 59, 62 (2d Cir. 2002) ("Every circuit court that has considered the issue has held that an escape, from whatever location by whatever means, constitutes 'conduct that presents a serious potential risk of injury to another.' "); *United States v. Luster*, 305 F.3d 199, 199–202 (3d Cir. 2002) (concluding that a conviction under a state escape statute that "extends to a 'walk away' from custody" is a conviction for a crime of violence under the Guidelines); *United States v. Dickerson*, 77 F.3d 774, 777 (4th Cir. 1996) (concluding that escape in violation of 18 U.S.C. § 751(a) is a crime of violence under § 4B1.2); *United States v. Ruiz*, 180 F.3d 675, 677 (5th Cir. 1999) (holding that "a knowing escape from lawful federal custody . . . constitutes a crime of violence under § 4B1.2," notwithstanding that the defendant merely walks away from a prison camp); *United States v. Harris*, 165 F.3d 1062, 1068 (6th Cir. 1999) (finding that a defendant's escape from a workhouse falls within the scope of § 4B1.2); *United States v. Bryant*, 310 F.3d 550, 553–54 (7th Cir. 2002) (concluding that a defendant's conviction for escape, resulting from his failure to return to his halfway house, constitutes a crime of violence); *United States v. Nation*, 243 F.3d 467, 472 (8th Cir. 2001) (declaring that "every escape, even a so-called 'walkaway' escape, involves a potential risk of injury to others"); *United States v. Turner*, 285 F.3d 909, 915 (10th Cir. 2002) (holding that an escape always constitutes a crime of violence, even when the defendant merely "fail[s] to return to a halfway house from work release") (internal quotation marks omitted); *United States v. Gay*, 251 F.3d 950, 954–55 (11th

Defendants Thomas and Cook had prior convictions for prison breach in violation of former D.C. Code § 22–2601 (1973). That statute provided, in relevant part: "Any person committed to a penal institution of the District of Columbia who escapes or attempts to escape therefrom, or from the custody of an officer thereof . . ., shall be guilty of an offense. . . ." Defendant Smith had a prior conviction for violating the District of Columbia's current "escape from an institution" provision, which states: "No person shall escape or attempt to escape from: (1) Any penal institution or facility in which that person is confined pursuant to an order issued by a court, judge, or commissioner of the District of Columbia." D.C. Code § 22–2601(a)(1) (2001).[5] Finally, in addition to his D.C. Code violation, Thomas had also been convicted of violating the federal escape statute, which makes it a crime to "escape[ ] or attempt[ ] to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General. . . ." 18 U.S.C. § 751(a).

We begin with common ground. First, both the defendants and the government agree that, in determining whether the crime of escape comes within the scope of Guideline § 4B1.2(a), we must utilize a categorical approach. *See Hill*, 131 F.3d at 1062; U.S.S.G. § 4B1.2, cmt. n.1 (stating that the relevant inquiry under § 4B1.2(a)(2) is whether the conduct "expressly charged . . . by its nature" presents a serious potential risk of physical injury); *see also Taylor v. United States*, 495 U.S. 575, 600–02 (1990); *Mathis*, 963 F.2d at 408.[6]

---

Cir. 2001) (concluding that even a walkaway escape from an unsecured facility constitutes a crime of violence).

[5] Subsection (a)(2) of the same statute bars escape from "(2) The lawful custody of an officer or employee of the District of Columbia or of the United States." D.C. Code § 22–2601(a)(2).

[6] *See also, e.g.*, *United States v. Pierce*, 278 F.3d 282, 286 (4th Cir. 2002); *Bryant*, 310 F.3d at 553–54; *Nation*, 243 F.3d at 472; *Harris*, 165 F.3d at 1068; *United States v. Hairston*, 71 F.3d 115,

Utilizing this approach, we must confine our review to the conduct prohibited by the statutes at issue or set forth in the charging papers, and " 'should *not* examine the actual conduct underlying the offense.' " *Hill*, 131 F.3d at 1062 (quoting *Mathis*, 963 F.2d at 408).[7]  In this case, because Smith's and Cook's escape indictments are devoid of detail, and Thomas' indictments were never proffered to the court, the parties agree that we should look no further than the statutory language. *See Taylor*, 495 U.S. at 600; *United States v. Luster*, 305 F.3d 199, 202 (3d Cir. 2002); *United States v. Pierce*, 278 F.3d 282, 287 (4th Cir. 2002).

The parties also agree that neither the D.C. Code provisions, nor the federal escape statute, fall within the first subsection of § 4B1.2(a).  That is, the offenses defined by those statutes do not have "*as an element* the use, attempted use, or threatened use of physical force against the person of another."  U.S.S.G. § 4B1.2(a)(1) (emphasis added).  Nor is escape one of the four crimes of violence specifically enumerated in § 4B1.2(a)(2): burglary, arson, extortion, or the use of explosives.  Thus, the only remaining question is whether escape falls within the "otherwise" clause of § 4B1.2(a)(2): a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 4B1.2(a)(2).

The defendants contend that the offenses for which they were convicted do not fall within the "otherwise" clause because they can be committed without force or violence.  As

117 (4th Cir. 1995); *United States v. DeLuca*, 17 F.3d 6, 8 (1st Cir. 1994).

[7] In some circumstances, a court may also examine jury instructions. *See Hill*, 131 F.3d at 1062 (citing *Taylor*, 495 U.S. at 602). In addition, if a defendant has pled guilty to a lesser included offense of a charge in an indictment, a sentencing court may examine certain other indices — such as a judgment of conviction, plea agreement, or statement by the defendant on the record. *See id.* at 1064–65; *see also United States v. Williams*, 2004 WL 330016, at *8 (D.C. Cir. 2004).  None of those circumstances are relevant here.

they correctly point out, the statutes at issue have been construed expansively. Knowingly absenting oneself from custody without permission is sufficient to constitute a violation.[8] Consequently, although both the federal and D.C. statutes prohibit escape from the lawful custody of an officer, *see* 18 U.S.C. § 751(a); D.C. Code § 22–2601(a)(2), walking away from a halfway house — or simply failing to return on time — violates the statutes as well.[9] And, as defendants further note, in *United States v. (Toumani) Thomas*, we expressed "reluctan[ce]" about extending § 4B1.2(a) to an offense that could include a "walkaway" escape, stating that "[a]rguably, the approach taken by the other circuits proves too much." 333 F.3d 280, 282 (D.C. Cir. 2003).

In *Thomas*, however, we made clear that our expression of concern was merely dicta, because there the defendant's prior conviction was specifically for "escape from an officer" under D.C. Code § 22–2601(a)(2), a crime that plainly involves a serious potential risk of injury. We thus did not have to decide whether a conviction for the offense of "escape from an institution," or for a general offense that encompasses both forms of escape, is likewise covered. Now that the issue is squarely before us, we conclude that our sister circuits, which regard such crimes (including walkaways) as violent offenses under § 4B1.2(a), are right. *See* cases cited *supra* note 4.

The fact that escape can be committed by a nonviolent walkaway does not shield it from designation as a crime of

---

[8]   *See United States v. Bailey*, 444 U.S. 394, 408 (1980) (concluding that "the prosecution fulfills its burden" under 18 U.S.C. § 751 by demonstrating "that an escapee knew his actions would result in his leaving physical confinement without permission," and need not also show "an intent to avoid confinement"); *Thurston v. United States*, 779 A.2d 260, 263 (D.C. 2001) (same under D.C. Code § 22–2601(a)).

[9] *See United States v. Vaughn*, 446 F.2d 1317, 1318 (D.C. Cir. 1971); *Thurston*, 779 A.2d at 262 n.4; *Gonzalez v. United States*, 498 A.2d 1172, 1174 (D.C. 1985); *see also Bailey*, 444 U.S. at 413 (holding that "escape from federal custody as defined in § 751(a) is a continuing offense and . . . an escapee can be held liable for failure to return to custody as well as for his initial departure").

violence for two reasons. First, the fact that escape can take place without force merely confirms the point upon which all parties have agreed: that escape does not have the use or threat of force "as an element," and thus does not fall within § 4B1.2(a)(1). Subsection (2) of 4B1.2(a), however, is an independent ground for designating an offense as violent, and hence it must cover crimes that do not have force as an element. And indeed it does: subsection (2) adds to the list of violent offenses those in which there is only a "serious potential risk" of injury.

Second, the fact that the defendants can hypothesize circumstances in which escape can be committed without either force or risk of injury cannot be dispositive under § 4B1.2(a), as such an analytical approach would eviscerate the notion of a "categorical" definition. *See United States v. Vigil*, 334 F.3d 1215, 1223 (10th Cir. 2003) ("[T]he possibility that a crime *may* be completed without injury is irrelevant to the determination of whether it constitutes a crime of violence within the meaning of § 4B1.2.") (emphasis added). Many concededly violent offenses can be hypothesized to take place in a manner that eliminates risk of injury: attempted murder,[10] for example, becomes riskless if we assume that the sniper's gun has no bullets. In essence, by assuming facts that render a crime riskless, the defendants effectively shave offense conduct down to the smallest possible "category" — the circumstances of any given case. In so doing, they circumvent the definitional question posed by the guideline: whether, as a category (i.e., "by its nature"), escape involves conduct that presents "a serious potential risk of physical injury to another," U.S.S.G. § 4B1.2, cmt. n.1.[11] *See United States v. Franklin*, 302 F.3d 722, 723 (7th Cir. 2002) (holding that, in determining whether escape poses a risk of violence,

---

[10] *See* Guideline § 4B1.2, cmt. n.1 (stating that the term " '[c]rime of violence' includes murder," as well as "attempting to commit" such an offense).

[11] For the same reason, we cannot accept the defendants' contention that "an offense is not categorically a crime of violence unless every such offense is." Reply Br. at 6.

"the benchmark should be the possibility for violent confrontation, not whether one can postulate a nonconfrontational hypothetical scenario") (internal quotation marks omitted).

With these preliminary points clarified, we now turn directly to that question. To answer it, we first consider the meaning of the phrase "serious potential risk." A "risk," of course, is merely "the possibility" of loss or injury. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1011 (10th ed. 1996). And while the addition of the adjective "serious" would seem to increase the required degree of probability, the interjection of the second adjective, "potential," appears to reduce it again.[12] In short, a textual analysis of the guideline's key phrase, by itself, sheds only a little light on our question.

The context in which the phrase "serious potential risk" resides, however, provides substantially more illumination.[13] The phrase is part of an "otherwise" clause that begins with a list of four offenses that the guideline regards as unquestionably crimes of violence: burglary of a dwelling, arson, extortion, and the use of explosives. And when a statute or regulation begins with a list of specific categories and ends with a general catch-all, the interpretative canons of *ejusdem generis* ("of the same kind or class") and *noscitur a sociis* (a word is "known by its associates") counsel that the latter be read in light of the former. *See Washington State Dep't of Soc. & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384–85 (2003).

Now we have something more to work with, and to apply to the issues raised by the defendants. It is true, as the defendants contend, that a person *can* escape without force or serious risk of injury to anyone by simply walking away from an unguarded halfway house; he may also peacefully end his

---

[12] *See* MERRIAM WEBSTER'S at 912 (defining "potential" as "existing in possibility," or as "something that can develop or become actual" — as in "a [potential] for violence").

[13] *Cf. Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

offense by waiting until the coast is clear and returning of his own volition. But the same is true of the individual who commits burglary of a dwelling: he can wait until the residents are on vacation and enter the house unarmed. The same is also true of the arsonist, who, with care, can avoid serious risk of physical injury to another by limiting his fires to isolated, abandoned buildings. *See Vigil*, 334 F.3d at 1223 (noting that § 4B1.2 "expressly includes arson and burglary of a dwelling as crimes of violence," notwithstanding that "a sizable percentage of burglaries and arsons occur in 'safely' unoccupied homes"). And injury can likewise be avoided by the extortionist — who can commit his crime by threatening to damage only the reputation of his victim, and who can target only the meek and the weak. *See, e.g.*, 18 U.S.C. § 875(d) (making it a crime to extort money by transmitting "any threat to injure the property or reputation of the addressee"); *United States v. DeLuca*, 17 F.3d 6, 8 (1st Cir. 1994) (holding that a state extortion statute that encompassed, "in addition to threats against the person, threats against the reputation, property or financial condition of another," was a crime of violence under § 4B1.2) (internal quotation marks omitted).

The issue, then, is whether the offense of escape — as a category — carries appreciably less risk of injury to another than do the listed crimes. *Cf. DeLuca*, 17 F.3d at 8 (holding that "the wording of the guideline tells us unequivocally that the Sentencing Commission believed that extortion, *by its nature*, should be classified as a crime of violence"). And in making that evaluation, we must keep in mind that escape is a "continuing offense," which does not end until the defendant is returned to custody. *United States v. Bailey*, 444 U.S. 394, 413 (1980) (referring to 18 U.S.C. § 751); *see Craig v. United States*, 551 A.2d 440, 440–41 (D.C. 1988) (referring to D.C. Code § 22–2601 (1973)). Hence, the risk of injury must be evaluated not only at the time of the defendant's escape from imprisonment, but at the time of his reapprehension as well.

Evaluated from that perspective, we have no basis for concluding that the risk of physical injury during an escape is any less than during a burglary, arson, or extortion. Like

burglary of a dwelling or arson, a defendant *may* accomplish an escape in the safest possible way. But just as the cautious burglar may be startled by the unexpected return of the homeowner, or the careful arsonist surprised by a fire that spreads out of control, the stealthy escapee may suddenly be confronted by police officers sent to apprehend him, leading to injury to the officers or bystanders. As the Second Circuit has observed:

> An inmate who escapes by peacefully walking away . . . will (if he can) be inconspicuous and discreet, and will (if he can) avoid confrontation and force. But escape invites pursuit; and the pursuit, confrontation, and recapture of the escapee entail serious risks of physical injury to law enforcement officers and the public.

*United States v. Jackson*, 301 F.3d 59, 63 (2d Cir. 2002); *see United States v. Turner*, 285 F.3d 909, 916 (10th Cir. 2002) ("Even though initial circumstances of an escape may be non-violent, there is no way to predict what an escapee will do when encountered by the authorities."); *United States v. Nation*, 243 F.3d 467, 472 (8th Cir. 2001) ("Even the most peaceful escape cannot eliminate the potential for violent conflict when the authorities attempt to recapture the escapee."). Accordingly, we conclude that the offense of escape is a crime of violence within the meaning of Guideline § 4B1.2(a), and we therefore deny the defendants' first ground of appeal.

## III

Defendants Thomas and Smith contend that their respective district judges also erred in denying their requests for downward departures pursuant to Guideline § 4A1.3. That provision permits the court to depart from the otherwise applicable guideline sentencing range if the defendant's criminal history category "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3, p.s. The defendants contend that their sentencing judges erred by relying on their arrest records in determin-

ing that their criminal history categories did not over-represent the seriousness of their criminal histories.

Although we have no authority to review a "court's discretionary decision that the particular circumstances of a given case do not warrant a departure," *United States v. Pinnick*, 47 F.3d 434, 439 (D.C. Cir. 1995), we can review a defendant's contention that a court's refusal to depart was based on "an incorrect application of the sentencing guidelines," 18 U.S.C. § 3742(a)(2). *See United States v. Joaquin*, 326 F.3d 1287, 1290 (D.C. Cir. 2003); *Pinnick*, 47 F.3d at 439. However, because the defendants here failed to raise this objection in the district court, our review is limited to scrutiny for plain error under Federal Rule of Criminal Procedure 52(b). *See United States v. Olano*, 507 U.S. 725, 731 (1993); *Joaquin*, 326 F.3d at 1290. Under that standard, we can overturn the district court's decision only if there was "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *Olano*, 507 U.S. at 732) (alteration in original). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted) (alteration in original).

In *United States v. Joaquin*, this circuit held that a district court errs, and that such an error is "plain," if the court relies on a defendant's prior arrest record itself (that is, on the fact of an arrest, without a conviction or other evidence that the alleged criminal conduct actually took place) in denying a motion to depart under the 2000 version of Guideline § 4A1.3. *See* 326 F.3d at 1292. The same guideline text is applicable to this case.[14] The court's decision in *Joaquin*, of course,

---

[14] In 2000, the text of § 4A1.3 permitted a departure if "reliable information," including "prior similar adult criminal conduct not resulting in a criminal conviction," indicated "that the criminal history category [did] not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant [would] commit other crimes." U.S.S.G. § 4A1.3, p.s. (2000).

binds this panel. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc). Nonetheless, the government contends that *Joaquin* is distinguishable from the cases at issue here because, in *Joaquin*, the district court "focused directly on Joaquin's arrests *alone*" and "decided not to depart because the arrest record standing by itself showed a propensity to commit crimes." Gov't Br. at 34–35. In contrast, the government submits, the courts that sentenced Thomas and Smith merely "mentioned appellants' arrest records, among many other facts." *Id.* at 35.

The government's effort to distinguish *Joaquin* misapprehends that case's holding. In *Joaquin*, the defendant's sentence was remanded, not because the district court relied on an arrest record alone, but "because, contrary to section 4A1.3's plain language, the district court based its decision *in part* on appellant's 'prior arrest record itself.'" 326 F.3d at 1288 (emphasis added). Since the government concedes that the district courts here also relied in part on the defendants' arrest records themselves,[15] *Joaquin* mandates the conclusion that those courts plainly erred. *See id.* at 1293.

---

But the text also stated that "a prior arrest record itself shall not be considered under § 4A1.3." *Id. Joaquin* read the latter as barring consideration of an arrest record in deciding a motion for either a downward or an upward departure. That language was unchanged both at the time Smith and Thomas committed their offenses and at the time they were sentenced, and it therefore applies to their cases. *See* U.S.S.G. § 1B1.11(a)-(b), p.s. We note, however, that the Sentencing Commission has recently amended § 4A1.3. Although it now expressly prohibits consideration of a prior arrest record "for purposes of an *upward* departure," U.S.S.G. § 4A1.3(a)(3) (2003) (emphasis added), it does not mention such a prohibition with respect to denying a downward departure, *id.* § 4A1.3(b)(2).

[15] *See also* Smith Sentencing Hr'g Tr. at 17 (May 1, 2003) (statement of the court) (noting that, "in about 14 years and 10 months, Mr. Smith has raked up approximately 20 arrests, eight convictions, five post-conviction violations and two crimes committed while serving sentences," and that "if one looks to these factors ... Mr. Smith's prospects for recidivism ... are high and the criminal

That conclusion does not, however, end our examination. Before we can correct a plain error, we still must determine whether that error satisfies the final two prongs of the Rule 52(b) standard: (3) that it " 'affect[s] substantial rights,' " i.e., that it is prejudicial; and (4) that it " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Johnson,* 520 U.S. at 467 (quoting *Olano,* 507 U.S. at 732) (alteration in original). With respect to the third prong, we note that, while the burden of establishing prejudice is on the defendant, *Olano,* 507 U.S. at 734, this circuit has held that burden to be " 'slightly less exacting' " in the context of sentencing errors as compared to trial errors, and that to meet it a defendant "need show only 'a reasonable likelihood' that the error affected the court's sentence," *Joaquin,* 326 F.3d at 1290 (quoting *United States v. Saro,* 24 F.3d 283, 287–88 (D.C. Cir. 1994)).

A comparison of the facts in *Joaquin* with those in defendant Smith's case again makes the former controlling. In *Joaquin*, the court found that, because Joaquin's record contained 11 arrests without convictions — all within 15 years of the instant offense — there was a reasonable likelihood that the district court would have reached a different decision regarding the seriousness of Joaquin's record absent consideration of those arrests. *See id.* at 1289, 1294. The court further found that such an error seriously affected the fairness and integrity of judicial proceedings. *Id.* at 1294. Defendant Smith's record — which likewise contains 11 arrests without convictions within 15 years of the instant offense — is indistinguishable.[16] Accordingly, because *Joaquin* held that

history category reflects properly Mr. Smith's criminal history as realistically portrayed"); Thomas Presentencing Hr'g Tr. at 37–38 (July 12, 2002) (statement of the court) ("reviewing very carefully the chronology of his arrests, incarcerations and releases on parole" and rejecting "the argument that the criminal history category overrepresents the likelihood of recidivism").

[16] *See* Smith PSR ¶¶ 43–53. The two defendants' records of prior arrests *with* convictions are also not materially different: Joaquin

such a record satisfied the final two prongs of the plain error standard, we can reach no other conclusion here. We therefore remand Smith's sentence to the district court.[17] On remand, of course, the district court is free to decline to depart again, as long as it does so without reference to the defendant's arrest record.

Defendant Thomas' sentencing presents a different case. By contrast to Joaquin's 11 relatively recent arrests without convictions, Thomas had only two within the previous 15 years. Thomas PSR ¶¶ 49, 50. Although Thomas also had older arrests that did not lead to convictions, all of those occurred more than 20 years before the instant offense and all but three led to unfavorable dispositions for the defendant. *Id.* ¶¶ 42–48.[18] Moreover, the number of times Thomas was arrested without convictions was dwarfed by his 12 prior adult arrests *with* convictions — as well as two additional probation revocations. *Id.* ¶¶ 26–37. On that record, we think it highly unlikely that it was Thomas' few and mostly stale arrests — rather than the sheer number of his convic-

---

had 6; Smith had 8. *See Joaquin*, 326 F.3d at 1289; Smith PSR ¶¶ 30–37.

[17] *See* 18 U.S.C. § 3742(f)(1) ("If the court of appeals determines that the sentence was imposed . . . as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate.").

[18] A number of Thomas' older arrests took place while he was in the Army, and, while they did not lead to criminal convictions, they did lead to Thomas' undesirable discharge. Thomas PSR ¶¶ 42, 43, 45. Although *Joaquin* bars the consideration of a " 'prior arrest record itself under § 4A1.3,' without supporting evidence indicating that [the defendant] had in fact engaged in prior criminal conduct not resulting in a conviction," *Joaquin*, 326 F.3d at 1293, an arrest that results in a discharge from the military is adequately supported (by the fact of the discharge) such that a court can reasonably rely upon it. *Cf. United States v. Ramirez*, 11 F.3d 10, 13 (1st Cir. 1993) (affirming the district court's reliance on an arrest record that was corroborated by extrinsic evidence); *United States v. Torres*, 977 F.2d 321, 330 (7th Cir. 1992) (same).

tions — that led the district court to conclude that the defendant's criminal history category appropriately reflected the seriousness of his criminal history. Thomas has thus failed to demonstrate a reasonable likelihood that the court's erroneous reference to his arrests affected the sentence that it imposed, and hence there is no reason for a remand.

## III

For the foregoing reasons, we affirm the sentences imposed on Thomas and Cook, and remand Smith's sentence for further proceedings consistent with this opinion.

*So ordered.*