IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34852-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON M. CATLING, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Jason Catling challenges mandatory legal financial obligations (LFOs) imposed following his conviction for delivering a controlled substance, heroin, arguing both that (1) no LFOs should have been imposed because his sole legal source of income is Social Security disability and (2) the superior court should have held a hearing to determine if his mental health condition required waiver of some mandatory LFOs even though he never requested a hearing. We conclude that (1) although the LFO order remains valid, the judgment and sentence must be modified to specify that repayment cannot be made from the proceeds of Social Security disability payments and (2) the failure to raise the mental health argument to the trial court precludes our review of that claim.

FACTS

Mr. Catling was charged in the Spokane County Superior Court with two counts of delivery of heroin resulting from sales of the drug to a police informant over a three month period. An agreement was reached and Mr. Catling pleaded guilty to one charge; the second count was dismissed. The parties jointly asked the court to impose a residential drug offender sentencing alternative (DOSA) sentence.

The ensuing evaluation recommended treatment. The trial court agreed and imposed the suspended 24-month residential DOSA sentence requested by the parties at the sentencing hearing held September 23, 2016. Discussion then ensued concerning LFO payments. Defense counsel told the court about a decision issued a day earlier, *City of Richland v. Wakefield*, 186 Wn.2d 596, 380 P.3d 459 (2016). He argued that although *Wakefield* only involved discretionary LFOs, its reasoning that federal law prohibited attachment of social security payments should also apply to mandatory LFOs and they should not be assessed against his client. Mr. Catling, age 36, told the court that he had been receiving the disability payments for about 10 years. His mother told the court that the payments had been received for more than 10 years. When asked about her son's condition, she described it as "based mostly on medical, but also some mental issues." Report of Proceedings (Sept. 23, 2016) (RP) at 9. She told the court that he had been born with his bladder turned inside out and that multiple surgeries to address the problem had caused her son pain and prevented him from working.

2

Not having read *Wakefield*, the court took the matter under advisement. By order entered the following Monday, the court imposed mandatory LFOs totaling $800—a $500 victim penalty assessment, a $200 filing fee, and a $100 DNA fee, payable at the sum of $25 per month. Clerk's Papers (CP) at 35. Two weeks later the defendant sought reconsideration of the LFOs on the basis of *Wakefield*. The motion reiterated counsel's sentencing argument that *Wakefield*'s reasoning should prevent imposition of any LFOs. The court denied reconsideration.

Mr. Catling timely appealed to this court, raising two challenges to the LFO rulings. A panel heard oral argument on the matter.

## ANALYSIS

Mr. Catling alleges that LFOs cannot be imposed against him nor collected from him because his sole source of income is a nonattachable federal disability payment. He also argues that the court erred in not considering whether his mental disability required remission of some of his LFOs under RCW 9.94A.777. We consider those contentions in the order listed.

*Mandatory LFOs and Disability Income*

Mr. Catling argues that mandatory LFOs are invalid under the supremacy clause for those, such as himself, whose only legal source of income is Social Security disability. We disagree with his contention that mandatory LFOs cannot be imposed in

3

his case, but we agree that the federal anti-attachment statute precludes a court from collecting LFO payments where the sole source of income is social security.

The constitution does not limit the ability of the states to impose financial obligations on convicted offenders; it only prohibits the enforced collection of financial obligations from those who cannot pay them. *Fuller v. Oregon*, 417 U.S. 40, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974); *State v. Blank*, 131 Wn.2d 230, 237-38, 930 P.2d 1213 (1997); *State v. Curry*, 118 Wn.2d 911, 915-16, 829 P.2d 166 (1992); *State v. Barklind*, 87 Wn.2d 814, 817-18, 557 P.2d 314 (1976). Thus, ability to pay is not considered when imposing mandatory costs and need only be considered at the time of collection. *State v. Lundy*, 176 Wn. App. 96, 102-09, 308 P.3d 755 (2013). However, Washington has long directed trial judges to consider a defendant's ability to pay prior to imposing *discretionary* court costs at sentencing. RCW 10.01.160(3). A motion to remit costs requires that trial courts adjudge the offender's current or future ability to pay those costs, but punishment for failure to pay can only be imposed if the refusal is willful. *Blank*, 131 Wn.2d at 241-42.

> The social security anti-attachment statute at issue here provides:
>
> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, *and none of the moneys paid or payable* or rights existing under this subchapter *shall be subject to execution, levy, attachment, garnishment, <u>or other legal process,</u>* or to the operation of any bankruptcy or insolvency law.

42 U.S.C. § 407(a) (emphasis added).

The italicized language sets forth the basic premise of the statute—neither current nor future social security payments are subject to seizure by any process of law. The underscored language ("other legal process") is key to appellant's argument. That language was authoritatively construed by the United States Supreme Court in an earlier case arising from this state. *Wash. State Dep't of Soc. & Health Srvs. v. Guardianship Estate of Danny Keffeler*, 537 U.S. 371, 123 S. Ct. 1017, 154 L. Ed. 2d 972 (2003).

At issue in *Keffeler* was the State's practice of using Social Security benefits paid to children in foster care. The foster children contended that the State's use of the money for foster care expenses was invalid under § 407(a) as an "other legal process." 537 U.S. at 383-84. The court disagreed, stating:

> Thus, "other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

*Id.* at 385. In other words, "other legal process" involves some means of transfer akin to garnishment or attachment.

*Wakefield* applied this understanding of "other legal process" to discretionary LFOs imposed against a homeless offender whose sole income consisted of Social Security disability payments. 186 Wn.2d at 599. The trial court had directed that she pay

5

$15 a month from her social security. *Id.* at 609. The court overturned the monthly payment, concluding its analysis of the "other legal process" language:

> Accordingly, we hold that federal law prohibits courts from ordering defendants to pay LFOs if the person's only source of income is social security disability.

*Id.* The court directed that Ms. Wakefield's remission motion be granted. *Id.* at 611.

The application of § 407(a) to an existing financial obligation also was at issue in a case cited by *Wakefield, In re Lampart*, 306 Mich. App. 226, 856 N.W.2d 192 (2014). There a mother was directed to make restitution for her juvenile son, who had committed arson. 856 N.W.2d at 194. Two years later, the mother suffered a heart attack, became unable to work, and started receiving Social Security disability payments. *Id.* Two years after the heart attack, the court conducted a hearing concerning her finances and reduced the payments by $100 per month due to the change in circumstances, while also ruling that enforcing the restitution order did not violate 42 U.S.C. § 407(a). *Id.* at 194-95. The following year, the mother challenged the restitution order by filing for relief from judgment, arguing that enforced collection of the restitution order violated § 407(a). *Id.* at 195. The trial court denied the motion, concluding that enforcement of the restitution order did not constitute "other legal process" under § 407(a). *Id.*

On appeal, the mother contended that (1) the Social Security benefits were exempt and could not be used to repay the obligation and (2) the restitution order should be canceled due to the fact that her sole income was the Social Security disability payment.

*Id.* 196. Applying *Keffeler*, the appellate court agreed with her first contention. The court concluded that a judicial mechanism was being used to attempt to transfer the Social Security benefits away from the recipient in order to satisfy a debt. When the contempt power is used to enforce the payment, it is an "other legal process" akin to attachment. *Id.* at 198-200.

The court then turned to the question of whether or not the restitution obligation should have been stricken. Noting that disability income is not a need-based[1] benefit, the court nonetheless cautioned that disability proceeds were still not attachable due to § 407(a). *Id.* at 202-03. However, the mother was not exempt from having to account for other income or assets that might be used to pay the debt. *Id.* at 201-03. It would not be a violation of § 407(a) to require the mother periodically to appear at a contempt hearing in order to allow the court to ascertain her income. *Id.* at 201. Although it would violate § 407(a) to make the mother pay the court from her disability income,

> we decline to conclude that the mere specter of a contempt hearing necessarily constitutes such "other legal process." That is, although we recognize that there is some level of threat and coercion inherent in a prospective contempt proceeding itself, the specter of contempt also can serve the legitimate purpose of providing a mechanism by which an obligor's assets and income can be determined.

*Id.* at 202. Thus, the court concluded that the restitution order remained valid. *Id.* at 203.

---

[1] *See Mathews v. Eldridge*, 424 U.S. 319, 340-41, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); 42 U.S.C. § 415; § 423; § 424(a).

*Wakefield* and *Lambert* answer Mr. Catling's appeal. Consistent with *Wakefield*, we agree that the order that Mr. Catling pay $25 per month cannot be enforced against his disability income per § 407(a). However, as in *Lambert*, there is nothing in § 407(a) that invalidates the underlying financial obligation. The anti-attachment provision prevents levying against social security disability proceeds, but it does not address the debt itself. The statute distinguishes between the *imposition* of LFOs and compelled *payment* of LFOs from the exempt proceeds of a Social Security payment.

We remand the case to superior court to amend its judgment and sentence to indicate that the LFOs may not be satisfied out of any funds subject to 42 U.S.C. § 407(a).[2]

*Mental Health Condition and LFOs*

Mr. Catling also briefly argues that his mother's remark about his mental health problems triggered an obligation for the trial court to inquire further about his ability to pay. We disagree. The offhand remark by a third party did not put the court on notice that a mental health disability was behind Mr. Catling's inability to pay or that he was prepared to establish that fact. He may raise the claim on remand if he so desires.

---

[2] We urge that the standard judgment and sentence forms be amended to include uniform language recognizing that payment obligations may not be satisfied from funds protected by 42 U.S.C. § 407(a).

At issue is a provision added to the Sentencing Reform Act of 1981, chapter 9.94A

RCW, during a 2010 overhaul of the Involuntary Treatment Act, chapter, 71.05 RCW.

> **Legal financial obligations—Defendants with mental health conditions.**
> (1) Before imposing any legal financial obligations upon a defendant who
> suffers from a mental health condition, other than restitution or the victim
> penalty assessment under RCW 7.68.035, a judge must first determine that
> the defendant, under the terms of this section, has the means to pay such
> additional sums.
> 　　(2) For the purposes of this section, a defendant suffers from a
> mental health condition when the defendant has been diagnosed with a
> mental disorder that prevents the defendant from participating in gainful
> employment, as evidenced by a determination of mental disability as the
> basis for the defendant's enrollment in a public assistance program, a
> record of involuntary hospitalization, or by competent expert evaluation.

RCW 9.94A.777.

Mr. Catling contends that his mother's passing mention of a mental health

component to his disability meant that the court was required to inquire further. We

disagree. Neither Mr. Catling nor his counsel invoked § 777 or indicated that they had

the necessary proof to satisfy the statute. While there was an indication from his mother

that Mr. Catling may have been diagnosed with a mental disorder, there was no indication

his unidentified condition prevented him "from participating in gainful employment."

RCW 9.94A.777(2).[3] His mother's statement expressly indicated that mental health was

---

[3] In this regard our fact pattern varies from that in *State v. Tedder*, 194 Wn. App. 753, 757, 378 P.3d 246 (2016). There the defendant had a history of involuntary hospitalizations, a condition that satisfied § 777(2).

a small part of his problem and that his disability award was "based mostly on medical" due to his birth defects.

Nonetheless, we are remanding for the court to clarify the payment order. Mr. Catling is free to raise a § 777 claim to the trial court if he believes he has the evidence to satisfy RCW 9.94A.777(2).

Affirmed and remanded.

Korsmo, J.

I CONCUR:

Siddoway, J.

No. 34852-1-III

FEARING, C.J. (dissenting) — The collateral consequences of a judgment for mandatory legal financial obligations demands that an offender, whose sole income derives from Social Security benefits, continuously submit to legal process because of his inability to retire the judgment. The judgment also coerces the offender to pay, from his or her meager social security resources, the financial obligations if he or she wishes to rid herself of legally processed restrictions or he or she desires to fully participate as a Washington citizen. Thus, Washington's system of mandatory legal financial obligations thwarts the federal law's anti-attachment statute protecting social security recipients. I therefore dissent.

The State does not dispute that Jason Catling's sole source of income constitutes Social Security disability payments. Catling, now age 37, was born with exstrophy, a protrusion of the urinary bladder outside the abdominal wall. Multiple surgeries to correct the problem have resulted in disabling pain to Catling. He has received Social Security benefits for more than ten years. He currently receives $753 per month.

The evidence from the record suggests that Jason Catling is permanently disabled and Social Security benefits will remain his sole source of income for the indefinite

future, if not the rest of his life. Until the last paragraph of this dissent, I proceed on these factual assumptions.

42 U.S.C. § 407(a) controls Jason Catling's appeal. The federal statute declares:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, *or other legal process*, or to the operation of any bankruptcy or insolvency law.

(Emphasis added.) Under the supremacy clause of the United States Constitution, conflict between state and federal laws must be resolved in favor of the overriding federal interest. *Philpott v. Essex County Welfare Board*, 409 U.S. 413, 417, 93 S. Ct. 590, 34 L. Ed. 2d 608 (1973). Thus, any state statutory scheme or program fails if in contravention of 42 U.S.C. § 407. *Philpott v. Essex County Welfare Board*, 409 U.S. at 417.

Jason Catling impliedly concedes that the judgment for mandatory legal financial obligations does not constitute an execution, levy, attachment, or garnishment under 42 U.S.C. § 407(a), assuming the State does not seek to collect payment from his Social Security payments. He argues instead that his Social Security benefits have become the subject of "legal process" for purposes of the federal anti-attachment statute. The State agrees not to seek payment from the disability payments and thus contends that it does not subject the Social Security benefits to legal process. After all, the State does not actively seek to seize the benefits.

2

No. 34852-1-III
*State v. Catling*—(dissenting)

This appeal asks what constitutes "legal process" within the meaning of 42 U.S.C. § 407 and whether the imposition of mandatory legal financial obligations functions as a "legal process." For the reasons already stated, I answer in the affirmative. The lingering judgment directly subjects Jason Catling to constant legal process and indirectly subjects his social security money to that process since the money constitutes his sole income. The judgment itself is the result of a legal process and that process constantly applies coercion to Catling to utilize his Social Security benefits to retire the judgment.

To fully answer the question on appeal, I first review Washington's scheme of mandatory legal financial obligations. I then return to a discussion of the implications of 42 U.S.C. § 407.

*Collateral Consequences of Washington's Mandatory Legal Financial Obligations*

The Washington code includes a maze of statutes, found in various titles, that creates a scheme of legal financial obligations assessed against a convicted offender. Under Washington's system of financial obligations, the superior court, upon a conviction, may order the defendant to pay restitution, costs, fines, and other assessments imprecisely labeled as legal financial obligations. RCW 9.94A.760(1). The financial obligations may include restitution to crime victims, the cost of incarceration, the cost of medical care during incarceration, a crime penalty or victim assessment fee despite also paying restitution to one's crime victims, a crime laboratory fee, the State's criminal case

3

filing fee, a deoxyribonucleic acid (DNA) collection fee, a domestic violence assessment,

the cost of a public defender, and a sheriff's service fee, among other costs. RCW

7.68.035; RCW 9.94A.760(2); RCW 10.01.160; RCW 10.99.080; RCW 36.18.020(2)(h);

RCW 43.43.7541.

Washington distinguishes between discretionary and mandatory legal financial

obligations, with three obligations categorized as mandatory. RCW 7.68.035 mandates

imposition of a $500 assessment for purposes of funding Washington's crime victim's

compensation program. The statute declares:

> (1)(a) When any person is found guilty in any superior court of having committed a crime . . . there shall be imposed by the court upon such convicted person a penalty assessment. The assessment shall be in addition to any other penalty or fine imposed by law and shall be five hundred dollars for each case or cause of action that includes one or more convictions of a felony or gross misdemeanor and two hundred fifty dollars for any case or cause of action that includes convictions of only one or more misdemeanors.

RCW 36.18.020 mandates assessment of a $200 filing fee upon a conviction:

> (2) Clerks of superior courts shall collect the following fees for their official services:
>
> . . . .
>
> (h) Upon conviction or plea of guilty, upon failure to prosecute an appeal from a court of limited jurisdiction as provided by law, or upon affirmance of a conviction by a court of limited jurisdiction, an adult defendant in a criminal case shall be liable for a fee of two hundred dollars.

In 2002 the Washington Legislature enacted a statute requiring courts to impose a $100

DNA collection fee with every sentence imposed for specified crimes, "unless the court

finds that imposing the fee would result in undue hardship on the offender." Former

RCW 43.43.7541 (2002). In 2008 the legislature passed an amendment to make the fee

mandatory regardless of hardship. *State v. Thompson*, 153 Wn. App. 325, 336, 223 P.3d

1165 (2009). The current version simply states that "Every sentence . . . must include a

fee of one hundred dollars." RCW 43.43.7541. Pursuant to these statutes, Jason

Catling's trial court imposed $800 in legal financial obligations in Catling's judgment

and sentence.

As already intimated, trial courts must impose the victim's compensation penalty,

the criminal case filing fee, and the DNA collection assessment regardless of a

defendant's indigency. *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013).

Stated differently, for mandatory legal financial obligations, the legislature has divested

courts of the discretion to consider a defendant's ability to pay when imposing these

obligations. *State v. Lundy*, 176 Wn. App. at 102. Mandatory legal financial obligations

are not "costs" under RCW 10.01.160(1) and (2), and, therefore, the mandatory

obligations are not subject to a motion to remit under RCW 10.01.160(4). *State v. Shirts*,

195 Wn. App. 849, 858 n.7, 381 P.3d 1223 (2016).

Other legal financial obligations imposed by the trial court, besides restitution, are

discretionary. By statute, the superior court may not order a defendant to pay

No. 34852-1-III
*State v. Catling*—(dissenting)

discretionary fees unless the defendant possesses or will possess the financial ability to

pay. RCW 10.01.160(3) reads:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

Under *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), the trial court now holds an

obligation to conduct an individualized inquiry into the ability of the offender to pay

discretionary legal financial obligations.

On the order imposing both mandatory and discretionary legal financial

obligations, the trial court should impose a monthly payment required to retire the

financial obligations, with payments being applied first to restitution. RCW

9.94A.760(1). Jason Catling's sentencing court imposed a payment schedule of $25 per

month. To my knowledge, Catling has never made a payment.

Washington courts have deemed mandatory obligations constitutional so long as

sufficient safeguards in the sentencing scheme prevent imprisonment of indigent

defendants. *State v. Curry*, 118 Wn.2d 911, 918, 829 P.2d 166 (1992); *State v. Lundy*,

176 Wn. App. at 102-03. Washington courts have relied on the United States Supreme

Court decision in *Fuller v. Oregon*, 417 U.S. 40, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974),

when identifying the needed safeguards.

6

> . . . *Fuller* implicitly held that several features of the Oregon statute [at issue in *Fuller*] are constitutionally required:
> 1. Repayment must not be mandatory;
> 2. Repayment may be imposed only on convicted defendants;
> 3. Repayment may only be ordered if the defendant is or will be able to pay;
> 4. The financial resources of the defendant must be taken into account;
> 5. A repayment obligation may not be imposed if it appears there is no likelihood the defendant's indigency will end;
> 6. The convicted person must be permitted to petition the court for remission of the payment of costs or any unpaid portion;
> 7. The convicted person cannot be held in contempt for failure to repay if the default was not attributable to an intentional refusal to obey the court order or a failure to make a good faith effort to make repayment.

*State v. Blank*, 131 Wn.2d 230, 237-38, 930 P.2d 1213 (1997).

One could question whether Washington's mandatory legal financial obligations scheme meets the *Fuller* criteria. *Fuller*'s conditions do not permit mandatory repayment, and, of course, Washington imposes mandatory legal financial obligation payments regardless of the offender's ability to pay. One might argue that repayment is not mandatory solely based on an order demanding payment unless the State seeks to collect from the offender. Nevertheless, condition five disallows an imposition of an obligation if the offender's indigency will not likely end. This language necessarily applies to the imposition of the financial obligations at the time of sentencing. Washington courts impose, as part of sentencing, mandatory legal financial obligations regardless of the offender's likely ability to pay in the future. Condition six demands that

the offender hold the right to petition for remission of payment of costs. As already noted, a Washington offender may not petition for remission of mandatory legal financial obligations.

*Fuller v. Oregon* only addressed the imposition of court appointed attorney fees on the offender, and the United States Supreme Court probably based its decision solely on the constitutional right to assistance of counsel. Nevertheless, courts have applied *Fuller*'s criteria outside the context of court-imposed repayment of counsel fees. Also, despite the language in *Fuller*, federal courts have held that costs of prosecution may constitutionally be imposed on a defendant who is indigent at the time of sentencing, because the offender may later acquire the means to pay. *United States v. Pagan*, 785 F.2d 378 (2d Cir. 1986); *United States v. Hutchings*, 757 F.2d 11 (2d Cir. 1985).

Inconveniences, burdens, punishments, and denial of rights ensue from a judgment for legal financial obligations, both mandatory and discretionary. The requirement that the offender pay a monthly sum toward a legal financial obligation constitutes a condition or requirement of a sentence, and the offender faces penalties for noncompliance. RCW 9.94A.760(10). An offender delinquent in payment of legal financial obligations faces contempt charges and imprisonment. RCW 9.94B.040 and 10.01.180. The judgment for obligations may also be enforced as a civil judgment. RCW 9.94A.760(4).

The offender avoids most of these extreme consequences if the State does not enforce payment.

Many other consequences result from the judgment for legal financial obligations regardless of whether the State actively seeks to collect payment. From the date of judgment, legal financial obligations bear interest at a rate of twelve percent per annum. RCW 10.82.090; RCW 4.56.110(4); RCW 19.52.020(1). The State may add collection fees to the sum of the financial obligations. RCW 36.18.16(29); RCW 9.94A.780(7); RCW 9.94A.760. Most importantly, the trial court retains jurisdiction over the offender until the defendant completely satisfies the financial obligations, regardless of the statutory maximum for the crime. RCW 9.94A.760(4). This latter statute plays a critical role in my analysis.

The sentencing court continuously monitors the offender and often requires court attendance at hearings to disclose his or her financial condition with the attendant disruption in the offender's schedule. RCW 9.94A.760(5) and (7) requires the defendant to provide information and documentation to the court clerk. RCW 9.94A.760(7)(b) declares in part:

> During the period of repayment, the county clerk may require the offender to report to the clerk for the purpose of reviewing the appropriateness of the collection schedule for the legal financial obligation. During this reporting, the offender is required under oath to respond truthfully and honestly to all questions concerning earning capabilities and the location and nature of all property or financial assets. The offender

shall bring all documents requested by the county clerk in order to prepare the collection schedule.

The Washington Supreme Court, in *State v. Blazina*, 182 Wn.2d 827 (2015), observed ills associated with legal financial obligations imposed against indigent defendants. The harms include increased difficulty in reentering society, the doubtful recoupment of money by the government, and inequities in administration. The trial court's lengthy involvement in collecting obligations inhibits reentry of the offender to society regardless of whether the State actively seeks to collect the judgment. Legal or background checks will show an active criminal record in superior court for individuals who have not fully paid their financial obligations. The active record impairs the defendant's access to employment, housing, and credit. Reentry obstacles increase the chances of recidivism.

A Social Security disability benefits recipient will likely not receive credit regardless of a judgment for legal financial obligations, and by definition the recipient is unemployable. 42 U.S.C.A. § 423(d)(2)(A). Thus, the employment and credit consequences of a judgment lack relevance. The recipient needs housing, however.

A judgment for mandatory legal financial obligations contains other serious consequences not noted in *State v. Blazina*. Unlike other offenders who pay all legal financial obligations, one who lacks the ability to pay financial obligations, including offenders whose sole source of income is Social Security benefits, may not garner a

restoration of civil rights. A certificate of discharge restores an offender's civil rights.

RCW 9.94A.637(5). The court will issue a certificate of discharge only when an offender

has completed all of his sentence requirements, including retirement of legal financial

obligations. RCW 9.94A.637(1)(a); *State v. Gossage*, 165 Wn.2d 1, 6, 195 P.3d 525

(2008). RCW 9.94A.637(1)(a) intones:

> When an offender has completed all requirements of the sentence, including any and all legal financial obligations, and while under the custody and supervision of the department [of corrections], the secretary or the secretary's designee shall notify the sentencing court, which shall discharge the offender and provide the offender with a certificate of discharge by issuing the certificate to the offender in person or by mailing the certificate to the offender's last known address.
> (b)(i) . . . .
> (ii) When the department has provided the county clerk with notice that an offender has completed all the requirements of the sentence and the offender subsequently satisfies all legal financial obligations under the sentence, the county clerk shall notify the sentencing court, including the notice from the department, which shall discharge the offender and provide the offender with a certificate of discharge by issuing the certificate to the offender in person or by mailing the certificate to the offender's last known address.
> (c) . . . When the offender satisfies all legal financial obligations under the sentence, the county clerk shall notify the sentencing court that the legal financial obligations have been satisfied. When the court has received both notification from the clerk and adequate verification from the offender that the sentence requirements have been completed, the court shall discharge the offender and provide the offender with a certificate of discharge by issuing the certificate to the offender in person or by mailing the certificate to the offender's last known address.
> . . . .
> (5) The discharge shall have the effect of restoring all civil rights not already restored by RCW 29A.08.520, and the certificate of discharge shall so state.

11

No. 34852-1-III
*State v. Catling*—(dissenting)

RCW 9.94A.637.

Jason Catling suffered a conviction of delivery of heroin, presumably a Class B felony, in violation of RCW 69.50.401. Catling could in ten years enjoy the benefits of vacation of his conviction, but will not receive the vacation until payment of the mandatory legal financial obligations. RCW 9.94A.640 declares:

> (1) Every offender who has been discharged under RCW 9.94A.637 may apply to the sentencing court for a vacation of the offender's record of conviction. If the court finds the offender meets the tests prescribed in subsection (2) of this section, the court may clear the record of conviction by: (a) Permitting the offender to withdraw the offender's plea of guilty and to enter a plea of not guilty; or (b) if the offender has been convicted after a plea of not guilty, by the court setting aside the verdict of guilty; and (c) by the court dismissing the information or indictment against the offender.
> (2) An offender may not have the record of conviction cleared if: . . . (e) the offense is a class B felony and less than ten years have passed since the date the applicant was discharged under RCW 9.94A.637; . . .
> (3) Once the court vacates a record of conviction under subsection (1) of this section, the fact that the offender has been convicted of the offense shall not be included in the offender's criminal history for purposes of determining a sentence in any subsequent conviction, and the offender shall be released from all penalties and disabilities resulting from the offense. For all purposes, including responding to questions on employment applications, an offender whose conviction has been vacated may state that the offender has never been convicted of that crime. Nothing in this section affects or prevents the use of an offender's prior conviction in a later criminal prosecution.

Vacation of a conviction means that a person is entitled to assert that he or she has never been convicted. *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001); *In re Discipline of Stroh*, 108 Wn.2d 410, 417-18, 739 P.2d 690 (1987). The legislature

12

intended to prohibit all adverse consequences of a dismissed conviction, with the one

exception of use in a subsequent criminal conviction. *State v. Breazeale*, 144 Wn.2d at

837-38.

The lack of a discharge also impacts Jason Catling's right to bear arms. RCW

9.41.040(4) reads:

> (a) Notwithstanding subsection (1) or (2) of this section, a person convicted . . . of an offense prohibiting the possession of a firearm under this section other than murder, manslaughter, robbery, rape, indecent liberties, arson, assault, kidnapping, extortion, burglary, or violations with respect to controlled substances under RCW 69.50.401 and 69.50.410, who received a probationary sentence under RCW 9.95.200, and who received a dismissal of the charge under RCW 9.95.240, shall not be precluded from possession of a firearm as a result of the conviction . . . . Notwithstanding any other provisions of this section, if a person is prohibited from possession of a firearm under subsection (1) or (2) of this section and has not previously been convicted . . . of a sex offense prohibiting firearm ownership under subsection (1) or (2) of this section and/or any felony defined under any law as a class A felony or with a maximum sentence of at least twenty years, or both, the individual may petition a court of record to have his or her right to possess a firearm restored:
> (i) Under RCW 9.41.047; and/or
> (ii)(A) If the conviction . . . was for a felony offense, after five or more consecutive years in the community without being convicted or found not guilty by reason of insanity or currently charged with any felony, gross misdemeanor, or misdemeanor crimes, if the individual has no prior felony convictions that prohibit the possession of a firearm counted as part of the offender score under RCW 9.94A.525.

No. 34852-1-III
*State v. Catling*—(dissenting)

The State may remove from Jason Catling his right to vote because of a failure to pay mandatory legal financial obligations and then Catling carries the burden to reinstate his voting rights. RCW 29A.08.520 declares:

> (1) For a felony conviction in a Washington state court, the right to vote is provisionally restored as long as the person is not under the authority of the department of corrections. For a felony conviction in a federal court or any state court other than a Washington state court, the right to vote is restored as long as the person is no longer incarcerated.
> (2)(a) Once the right to vote has been provisionally restored, the sentencing court may revoke the provisional restoration of voting rights if the sentencing court determines that a person has willfully failed to comply with the terms of his or her order to pay legal financial obligations.
> . . . .
> (3) If the court revokes the provisional restoration of voting rights, the revocation shall remain in effect until, upon motion by the person whose provisional voting rights have been revoked, the person shows that . he or she has made a good faith effort to pay as defined in RCW 10.82.090.
> . . . .
> (6) The right to vote may be permanently restored by one of the following for each felony conviction:
> (a) A certificate of discharge issued by the sentencing court, as provided in RCW 9.94A.637. . . .

Another voter may contest an election during which a felon, whose civil rights have not been restored, votes. RCW 29A.68.020(3).

*Social Security Anti-Attachment Statute*

I now review whether the imposition of a judgment for legal financial obligations or the collateral consequences accompanying mandatory legal financial obligations thwart the anti-attachment provisions protecting a recipient of Social Security disability

14

payments. Since Jason Catling seeks relief directly under 42 U.S.C. § 407, he presumably receives disability insurance payments under the old-age, survivors, and disability insurance (OASDI) program rather than the supplemental security income (SSI) program, since 42 U.S.C. § 407 applies to the former program. Acronyms for disability payments under the OASDI program include SSDI or DI benefits. Whether Catling receives OASDI payments or SSI payments lacks relevance. The "Supplemental Security Income Act" adopts the same exemptive language for SSI payments. 42 U.S.C. § 1383(d)(1).

To repeat, 42 U.S.C. § 407(a) reads, in relevant part, that Social Security benefit payments under the OASDI program shall not "be subject to execution, levy, attachment, garnishment, or other legal process." 42 U.S.C. § 407(a) represents a clear choice by Congress to exempt all Social Security benefits, whether from OASDI or SSI, from any legal process, save for a few enumerated exceptions. *Bennett v. Arkansas*, 485 U.S. 395, 398, 108 S. Ct. 1204, 99 L. Ed. 2d 455 (1988). Congress intended the exemption afforded in 42 U.S.C. § 407 to protect social security beneficiaries from creditor's claims. *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1093 (9th Cir. 2012). Depletion of the Social Security benefits defeats the purpose of the program. *Schweiker v. Wilson*, 450 U.S. 221, 223, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981). In turn, the Social Security Act serves to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze*, 345 F.2d 894, 897 (10th Cir. 1965).

15

This appeal asks if a judgment for legal financial obligations reposing in court against a social security recipient violates 42 U.S.C. § 407(a). I find no case directly on point to answer the question of whether the entry of or the collateral consequences of financial obligations imposed on an offender violate the federal statute when the State does not actively seek to seize the offender's social security funds but maintains a judgment against the offender. Regardless, the judgment violates both the letter and spirit of the anti-attachment statute.

The United States Supreme Court has declared that 42 U.S.C. § 407 imposes "a broad bar against the use of any legal process to reach all social security benefits." *Philpott v. Essex County Welfare Board*, 409 U.S. at 417 (1973). The provisions of § 407(a) apply to government entities as creditors. *Philpott v. Essex County Welfare Board*, 409 U.S. at 417. The bar extends to benefits deposited in a financial institution account. *Philpott v. Essex County Welfare Board*, 409 U.S. at 416. The federal statute admits no implied exceptions. *Bennett v. Arkansas*, 485 U.S. at 395 (1988).

Federal and state courts have applied the anti-attachment provision of 42 U.S.C. § 407(a) in many decisions. An important principle emanating from the case law is that Congress intended the words "or other legal process" to embrace not only the use of formal legal machinery but also resort to express or implied threats and sanctions. *Fetterusso v. New York*, 898 F.2d 322, 328 (2nd Cir. 1990). Otherwise, a creditor can

16

avoid the statute's application by coercing payment through threats of process. The government creditor should not be allowed to do indirectly what it cannot do directly. *In re Lampart*, 306 Mich. App. 226, 856 N.W.2d 192, 200 (2014). An implied or express threat of formal legal sanction constitutes a "legal process" within the meaning of section 407(a). *Crawford v. Gould*, 56 F.3d 1162, 1167 (9th Cir. 1995); *King v. Schafer*, 940 F.2d 1182, 1185 (8th Cir. 1991); *Moore v. Colautti*, 483 F. Supp. 357, 368 (E.D. Pa. 1979), *aff'd*, 633 F.2d 210 (3d Cir. 1980); *Becker County Human Services v. Peppel*, 493 N.W.2d 573, 575 (Minn. Ct. App. 1992).

The social security nonassignment provision was not designed to preclude use of only the judicial process to obtain Social Security benefits. *Crawford v. Gould*, 56 F.3d at 1166. "Other legal process" is not limited to court-initiated enforcement proceedings. *Crawford v. Gould*, 56 F.3d at 1167.

In *Brinkman v. Rahm*, 878 F.2d 263 (9th Cir. 1989), patients involuntarily committed to Washington state mental hospitals challenged the State's seizure of Social Security OASDI benefits. The State seized the payments to reimburse it for the cost of care. The federal court held that state law allowing seizure conflicted with 42 U.S.C. § 407. The State argued that it did not engage in any "legal process" within the meaning of the statute when it withdrew the money from the patient's accounts established in the hospital's accounting office. The court disagreed and stated the State could not avoid the

17

preemption contained in the social security statute by confiscating Social Security benefits without the benefit of any legal process. Of course, *Brinkman* differs from our appeal since the State actually took the Social Security benefits. Nevertheless, the decision confirms that the government may violate the anti-attachment statute without formal use of court machinery.

The United States Supreme Court most recently construed 42 U.S.C. § 407 in a suit originating in Washington State, *Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385, 123 S. Ct. 1017, 154 L. Ed. 2d 972 (2003). The court reasoned that "other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment and, at a minimum, should involve utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability. *Keffeler* may narrow some of the broader readings of 42 U.S.C. § 407 by lower federal and state courts, but the decision did not expressly overrule any decisions.

In *Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003), a class of children in foster care receiving Social Security benefits paid to the state as representative payee alleged that the Department of

Social and Health Services violated federal law by reimbursing itself for foster care expenditures from the benefits. The Supreme Court held that a state's use of Social Security benefits that it received in its capacity as "representative payee" of foster care children, in order to reimburse itself for some of its initial expenditures on foster care children's behalf, did not violate 42 U.S.C. § 407(a). Federal regulations allowed certain creditors to serve as representative payees and allowed a representative payee to satisfy even old debts of a beneficiary so long as current and reasonably foreseeable needs would be met and reimbursement furthers the beneficiary's interest. 20 CFR §§ 404.2040(d), 416.640(d). The federal regulations may be key to the *Keffeler* decision.

State courts, some after *Keffeler*, have addressed the viability of a court order that compels a criminal offender to use Social Security benefits to pay a judgment for costs. In *In re Michael S.*, 206 W. Va. 291, 524 S.E.2d 443 (1999), the West Virginia high court held that a court may not order a juvenile criminal defendant to pay restitution from his future supplemental security income benefits. In *In re Lampart*, 306 Mich. App. 226, 856 N.W.2d 192 (2014), the Michigan appeals court also ruled that the court cannot order payment of restitution from Social Security benefits. Unlike our appeal, the Michigan and West Virginia decisions entail a direct order to apply Social Security benefits to the financial obligations.

19

The Montana Supreme Court went further and, in *State v. Eaton*, 323 Mont. 287, 293, 99 P.3d 661 (2004), held that a defendant's Social Security disability income could not be included in a person's total income for purposes of calculating the monthly amount he could pay under a criminal sentence, since the inclusion "improperly burdens his social security benefits." Note that the state action involved no seizure of benefits but only placed a burden on the offender and his benefits.

In the Evergreen State, our state Supreme Court recently ordered remission of discretionary legal financial obligations when the offender's sole source of income was Social Security benefits. *City of Richland v. Wakefield*, 186 Wn.2d 596, 380 P.3d 459 (2016). Briana Wakefield successfully argued that the court order of financial obligations violated 42 U.S.C. § 407(a) because the order legally required her to pay from her Social Security disability benefits.

The *Wakefield* court noted *In re Lampart* and *State v. Eaton* and wrote:

> These [Montana and Michigan] courts have rejected the view that the antiattachment provisions prohibit only direct attachment and garnishment, and have instead held that a court ordering LFO payments from a person who receives only social security disability payments is an "other legal process" by which to reach those protected funds. This comports with the [United States] Supreme Court's key ruling on the definition of "other legal process," which explained that it is a process that involves "some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability." *Wash. State Dep't of Soc. &*

20

*Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385, 123 S. Ct. 1017, 154 L. Ed. 2d 972 (2003).

*City of Richland v. Wakefield*, 186 Wn.2d at 609.

A narrow reading of *City of Richland v. Wakefield* would apply its holding only to instances when the social security recipient pays some money to the State. A broader reading of *Wakefield* would preclude the State from procuring or preserving any judgment for financial obligations against the recipient. The *Wakefield* court impliedly agreed with other courts that held a court order of legal financial obligations by itself constitutes "legal process" that impacts the Social Security beneficiary. 186 Wn.2d at 609.

I need not rest my dissent on a broad reading of *City of Richland v. Wakefield*. If Jason Catling enjoyed other sources of income, he likely could retire the mandatory legal financial obligations. Nevertheless, because of his disability, he abides trapped in an enduring legal process and he suffers other coercive consequences.

In the previously discussed decision, *In re Lampart*, 856 N.W.2d 192 (2014), the Michigan court reversed a court order that employed the civil contempt powers to enforce a restitution order because the State, through a formal procedure, would gain control over the offender's SSDI benefits. The court qualified its ruling by stating the court might freely and periodically direct the offender to attend a hearing to disclose her assets and sources of income as long as the court avoids any directive that will cause the offender to invade her Social Security disability benefits to satisfy the continuing obligation. One

21

wonders if the Michigan court would permit an order for contempt if the offender failed to appear for such a debtor's examination.

I disagree with the ruling in *Lampart*. Compelling an offender to attend a court hearing constitutes employment of the legal process. The State does not directly seize the offender's Social Security benefits. Nevertheless, the State still arrays the legal process in an attempt to gain payment despite knowing federal law protects the offender's only income fund. Because of the offender's inability to pay, he remains stuck in an ongoing, burdensome court process.

Other collateral consequences coerce an offender to invade his Social Security disability benefits to satisfy the order of mandatory legal financial obligations. The offender cannot exercise rights, including constitutional rights, available to others without relinquishment of his protected benefits. Catling remains under the penalty of denial of voting and gun rights and the right to vacate and discharge his conviction. In this sense, the State will continuously hold a lien on Catling's civil rights and encumber his Social Security disability benefits until he pays all of his legal financial obligations from this sheltered source.

*Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003), suggests that social security money must actually change hands from the citizen to the State for the anti-attachment statute to apply.

22

Nevertheless, sound reasoning supports the extrapolation that a State may not engage in coercive processes to encourage the offender to relinquish his Social Security benefits to regain rights. *State v. Eaton*, 323 Mont. at 293 (2004) involved no transfer of social security funds from the offender to the State, but the court still deemed the government action to thwart receipt of Social Security benefits.

The State has failed to explain any purpose behind the judgment for mandatory legal financial obligations when Jason Catling will never be able to pay. The judgment only serves to harass one suffering from a disability who receives a small monthly sum as a result of the disability. As in *State v. Eaton*, the judgment burdens Catling and his income from social security.

I am aware that, in some instances, courts may preclude the unconstitutional impacts of a statutory scheme by declaring those impacts void while saving the scheme. The State, however, does not suggest this remedy to the extent necessary to comply with 42 U.S.C. § 407(a). Because the Washington Legislature wanted some legal financial obligations to remain mandatory, I question the wisdom of reordering the legislature's intent.

On the one hand, the State has not conceded that Jason Catling will be limited to Social Security disability payments as his only supply of income in the indefinite future. On the other hand, the State has also not argued that Catling will likely receive income

23

No. 34852-1-III
*State v. Catling*—(dissenting)

from another source in the future. Assuming the State wishes to maintain its judgment against Catling, I would remand to the trial court to determine whether Jason Catling will likely receive other income in the indefinite future. I would direct the sentencing court to strike the judgment for mandatory legal financial obligations if the court finds to the contrary or the State agrees to the contrary.

_____
Fearing, C.J.